11 F.3d 346
 UNITED STATES of America, Appellee,
v.
Claudia WILSON, also known as Claudia Alban; Oscar Sanchez;
Omar Sanchez; Ferdinand Romero, also known as Feldi, also
known as Samuel Red, also known as Colorado; Yhan Rivera,
also known as Lucho, also known as Lucha Lopera, also known
as Jesus Maria Lopera Castro, also known as Carlos Herrera;
Herson Y. Hoyos, also known as Jessie; Ricardo Sanchez,
also known as Richard, also known as Jose Carmelo
Perez-Galban, also known as Franklyn Delacruz, Defendants-Appellants.
 Nos. 68, 74-80, Dockets 92-1419(L), 92-1400, 92-1420 to
92-1424 and 92-1427.
 United States Court of Appeals,
Second Circuit.
 Argued Sept. 10, 1993.
Decided Dec. 3, 1993.
 
 Stephen R. Lewis, Stephens, Buderwitz, Baroni, Reilly & Lewis, White Plains, NY, for defendant-appellant Claudia Wilson.
 Lawrence Sheehan, Alemany, Laskorski & Sheehan, Scarsdale, NY, for defendant-appellant Oscar Sanchez.
 Omar Sanchez, pro se.
 Faith Colangelo, Dobbs Ferry, NY, for defendant-appellant Ferdinand Romero.
 David L. Lewis, New York City, for defendant-appellant Yhan Rivera.
 Robert M. Beecher, Law Office of Robert Beecher, New York City, for defendant-appellant Herson Y. Hoyos.
 David M. Samel, White Plains, NY, for defendant-appellant Ricardo Sanchez.
 Ira M. Feinberg, Asst. U.S. Atty., S.D.N.Y., New York City (Mary Jo White, U.S. Atty., James A. Goldston, John W. Auchincloss II, Asst. U.S. Attys., of counsel), for appellee.
 Before: NEWMAN, Chief Judge, and PIERCE and MINER, Circuit Judges.
 MINER, Circuit Judge:
 
 
 1
 Defendants-appellants Claudia Wilson, Oscar Sanchez ("Oscar"), Omar Sanchez ("Omar"), Ferdinand Romero, Yhan Rivera, Herson Hoyos and Ricardo Sanchez ("Ricardo") appeal from judgments of conviction and sentence entered in the United States District Court for the Southern District of New York (Brieant, C.J.) on July 21 and July 27, 1992, following a jury trial, convicting them of narcotics and narcotics-related offenses arising out of conspiracies to import and distribute cocaine. All of the defendants were convicted of conspiracy to distribute and possess with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 846 & 841(b)(1)(A) (1988 & Supp. III 1992). In addition, Ricardo and Wilson were convicted of conspiracy to import into the United States more than 500 grams of cocaine, in violation of 21 U.S.C. Secs. 952(a), 960(a)(1) & 963 (1988), of importing cocaine into the United States (two counts), in violation of 21 U.S.C. Secs. 952(a), 960(a)(1) and 960(b)(2) (1988 & Supp. III 1992), and of knowingly employing a minor to violate the narcotics laws, in violation of 21 U.S.C. Sec. 861(a)(1) (1988). The appellants also were convicted of the following offenses: Wilson, on one count of distributing and possessing with intent to distribute cocaine and one count of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) & 841(b)(1)(B); Ricardo, on two counts of distributing and possessing with intent to distribute cocaine and one count of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) & 841(b)(1)(B) and one count of using a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. Sec. 924(c) (1988 & Supp. III 1992); Oscar, on two counts of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) & 841(b)(1)(B); Omar, on one count of distributing and possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) & 841(b)(1)(C); Romero, on two counts of distributing and possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1) & 841(b)(1)(C); Rivera, on four counts of distributing and possessing with intent to distribute cocaine and three counts of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(B) and 841(b)(1)(C); and Hoyos, of two counts of distributing and possessing with intent to distribute cocaine and two counts of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Secs. 841(a)(1), 841(b)(1)(B) & 841(b)(1)(C) and one count of using a firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. Sec. 924(c).
 
 BACKGROUND
 
 2
 The indictments in this case were the culmination of a seventeen-month investigation conducted by the Mid-Hudson Drug Enforcement Task Force (the "Task Force"), a joint federal, state and local task force based in Newburgh, New York. Although focusing initially on suspected cocaine distributors in the Newburgh area, the investigation ultimately uncovered a group of distributors, based in Queens, New York, who were importing cocaine from Central and South America and supplying cocaine to the Newburgh distributors.
 
 
 3
 The evidence adduced at trial revealed that the seven appellants were members of a conspiracy to distribute cocaine and crack from January of 1990 until the last four of them were arrested in September of 1991. Ricardo and Wilson, who are husband and wife, were the leaders of the importation and distribution conspiracies. The two oversaw the importation of cocaine and the distribution of cocaine to other members of the conspiracy in, among other locations, Queens, Bronx and the Newburgh area.
 
 
 4
 Appellants Oscar and Omar, brothers of Ricardo, and appellants Rivera and Hoyos also were based in Queens and, in association with Ricardo and Wilson, distributed cocaine in the Newburgh area and other locations. Hoyos is the cousin of Wilson and was a close associate of Wilson and Ricardo, assisting them in the delivery of cocaine and the collection of proceeds from the sale of cocaine. Hoyos also acted as a supplier for Wilson and Ricardo and other members of the conspiracy. Rivera also was a close associate of Wilson and on several occasions supplied her with cocaine for distribution to other members of the conspiracy. After moving to Newburgh in March of 1990, Rivera engaged in the distribution of cocaine and crack on a continuing basis. Appellant Romero was a Beacon, New York-based cocaine distributor who purchased cocaine supplies from, among others, Ricardo, Wilson, Omar and Rivera.
 
 
 5
 The initial indictment in this case was filed on April 1, 1991. A third superseding indictment was filed on January 6, 1992, naming the seven appellants in this case. In response to a pretrial motion, the district court dismissed without prejudice Count One of the third superseding indictment, which charged the conspiracy to distribute cocaine, for violation of the Speedy Trial Act, 18 U.S.C. Secs. 3161-3174 (1988).
 
 
 6
 A twenty-four count fourth superseding indictment ("the Indictment") was filed on January 14, 1992 and was identical to the January 6 indictment. Count One of the Indictment charged that, from January of 1990 through the date of the Indictment, the seven appellants and others conspired to distribute and possess with intent to distribute five kilograms and more of cocaine and fifty grams and more of cocaine base, in violation of 21 U.S.C. Secs. 841(b)(1)(A) and 846. Count Two charged that from April of 1990 through the date of the Indictment Ricardo, Wilson and others conspired to import into the United States five hundred grams and more of cocaine, in violation of 21 U.S.C. Secs. 952(a), 960(a)(1), 960(b)(2) and 963. The remaining counts charged the individual defendants with various substantive narcotics and firearms offenses.
 
 
 7
 The trial commenced on January 21, 1992 and concluded on March 13, 1992. The testimony at trial included that of co-conspirators Gustavo Ospina-Roldan, an established Newburgh cocaine distributer, Christian Rojas, Diana Mereness and Hugo Jaramillo, each of whom had pleaded guilty to various offenses related to the conspiracy and cooperated with the Government. Prior to submitting the case to the jury, the district court dismissed two of the counts of the Indictment. The jury found all seven appellants guilty of the conspiracy charged in Count One and further found that the objects of the conspiracy included the distribution of five kilograms or more of cocaine and fifty grams or more of cocaine base. The jury acquitted Oscar on Count Nine, which charged that in May of 1990 he possessed with intent to distribute fifty grams and more of crack cocaine, and convicted all defendants on all remaining counts. The defendants were sentenced on July 20 and 27, 1992 to terms of imprisonment ranging from 384 months for Ricardo and Oscar to 144 months for Omar and Romero.
 
 DISCUSSION
 
 8
 The appellants contend that the district court committed numerous errors during the pretrial hearings and during the course of the eight-week trial.
 
 1. Search of Oscar Sanchez's Apartment
 
 9
 Oscar challenges the decision of the district court, after a suppression hearing, to admit evidence seized during a November 10, 1990 search of his apartment and statements he made during and shortly after this search. At 2:00 a.m. on the morning of November 10, agents of the Task Force went to an apartment located at 37-46 80th Street in Jackson Heights, Queens where, according to their information, members of the Sanchez family resided. The agents' purpose in going to the apartment was to arrest Ricardo or to obtain information regarding his whereabouts. DEA Special Agent Patrick Cardiello knocked on the door of the apartment. With Agent Cardiello were four other Task Force members, who had their guns drawn and pointed either in the air or toward the ground. Oscar, fully dressed, answered the door, at which time Agent Cardiello identified the group as police officers and, according to the agents' version of the facts, requested permission to search the apartment.
 
 
 10
 Oscar asked the officers what they were searching for, to which Agent Cardiello replied "drugs and guns." This conversation took place in English. At this time, according to the agents' version, Oscar consented to the search. During the ensuing search, the agents seized a .25-caliber handgun apparently belonging to Oscar.
 
 
 11
 Oscar's version of what occurred that morning differs from that of the agents. According to Oscar, the officers pointed their guns at him and did not ask permission to enter the apartment. He alleges that they placed him against the wall of the apartment, frisked him and proceeded to search the apartment, asking for consent only when they had nearly completed the search. It is clear, however, that at no time during the course of these events did the officers inform Oscar that he had a right to refuse to consent to the search. Moreover, there is evidence that Oscar had only a limited working knowledge of English and a limited education, consisting of only two years of high school in Colombia.
 
 
 12
 Until the time the agents seized the handgun, Oscar was not, according to the agents, in custody and was free to ask the agents to leave. After the handgun was found, Agent Cardiello made phone calls to the New York Police and to the United States Attorney's Office; only during this short interval was Oscar apparently not free to ask the agents to leave. The agents then notified Oscar that they were not going to arrest him, and he gave them an address where they could find Ricardo. The agents left the apartment at approximately 3:15 a.m.
 
 
 13
 Upon discovering that the address provided by Oscar was erroneous, Detective Sergeant Michael Truncale and Detective Ellsworth Weygant headed back to the apartment. On their way, they encountered Oscar, who was walking on the street. Detective Weygant told Oscar that they needed more information and, at Weygant's request, Oscar joined the officers in their car. The agents spent the next two-and-one-half hours attempting to locate Ricardo. During this time, Oscar told the two agents that he used to sell cocaine but no longer did so. At his request, the agents took Oscar home about 6:30 a.m. Oscar was not arrested until September 4, 1991--ten months later.
 
 
 14
 In a January 15, 1992 opinion ruling on the suppression motions, the district court credited the testimony of the Task Force agents and found that, viewing the totality of the circumstances, the Government had established by a preponderance of the evidence that Oscar had consented to the search and that this consent was the product of his free and unconstrained choice, rather than his mere acquiescence in a show of authority. The .25-caliber handgun subsequently was introduced at trial, and, at sentencing, it served as the basis for a two-level enhancement to Oscar's offense level. See U.S.S.G. Sec. 2D1.1(b)(1) (providing for two-level enhancement to narcotics offense if a firearm was possessed during its commission). The district court also concluded that the statements made by Oscar during and after the search were admissible, despite the fact that he had not been given Miranda warnings, because the statements were not the product of a custodial interrogation.
 
 
 15
 Whether an individual has consented to a search is a question of fact to be determined by the "totality of all the circumstances." Schneckloth v. Bustamonte, 412 U.S. 218, 227, 93 S.Ct. 2041, 2048, 36 L.Ed.2d 854 (1973). Consent must be a product of that individual's free and unconstrained choice, see United States v. Arango-Correa, 851 F.2d 54, 57 (2d Cir.1988), rather than a mere acquiescence in a show of authority, see United States v. Vasquez, 638 F.2d 507, 524 (2d Cir.1980), cert. denied, 450 U.S. 970, 101 S.Ct. 1490, 67 L.Ed.2d 620 (1981).
 
 
 16
 Oscar's limited education and knowledge of the English language, coupled with the fact that he was not informed of his right to refuse consent to the search, cause us to doubt whether Oscar actually consented to this search, particularly in light of the intrusive nature of the agents' entry into the apartment. But we need not decide the question of consent, for we conclude that the introduction of the handgun at trial, as to Oscar, was harmless error.
 
 
 17
 In order to determine that a particular error was harmless, when that error involves a constitutional violation, we must be satisfied that there was no "reasonable possibility that the evidence complained of might have contributed to the conviction," Chapman v. California, 386 U.S. 18, 23, 87 S.Ct. 824, 827, 17 L.Ed.2d 705 (1967) (quoting Fahy v. Connecticut, 375 U.S. 85, 86-87, 84 S.Ct. 229, 230, 11 L.Ed.2d 171 (1963)), and that the error was harmless beyond a reasonable doubt, id. at 24. See also Brecht v. Abrahamson, --- U.S. ----, ----, 113 S.Ct. 1710, 1713, 123 L.Ed.2d 353 (1993). Oscar was convicted of conspiracy to distribute and possess with intent to distribute cocaine and cocaine base and of two substantive counts of possessing with intent to distribute cocaine, in violation of 21 U.S.C. Sec. 841. The evidence introduced at trial establishing Oscar's guilt on these charges was, as the district court found, "overwhelming." This evidence included the eyewitness testimony of three co-conspirators who were cooperating with the Government, which clearly established Oscar's guilt of the possession with intent to distribute counts and unequivocally linked him to the conspiracy.
 
 
 18
 Although we recognize that guns are often viewed as "tools of the trade" of narcotics dealers, see, e.g., United States v. Torres, 901 F.2d 205, 235 (2d Cir.), cert. denied, 498 U.S. 906, 111 S.Ct. 273, 112 L.Ed.2d 229 (1990), in this case we believe the handgun was only remotely related to establishing Oscar's guilt of the narcotics offenses. In light of the overwhelming evidence bearing directly on the narcotics offenses, we are convinced that the admission of the handgun, even if it was improper, was harmless beyond any reasonable doubt. Cf. United States v. Lynch, 934 F.2d 1226, 1233-34 (11th Cir.1991) (admission of firearms was harmless error as to counts not involving firearms), cert. denied, --- U.S. ----, 112 S.Ct. 885, 116 L.Ed.2d 788 (1992).
 
 
 19
 Oscar next argues that the statements he made to the agents in the apartment and in the agent's car should have been suppressed because he was not advised of his Miranda rights. We reject this argument because we find that the district court properly concluded that there was no Miranda violation since Oscar was not in custody at the time the statements at issue were made. See Beckwith v. United States, 425 U.S. 341, 346-47, 96 S.Ct. 1612, 1616, 48 L.Ed.2d 1 (1976); United States v. Mitchell, 966 F.2d 92, 98 (2d Cir.1992).
 
 2. Speedy Trial Act Violation
 
 20
 Rivera, Hoyos and Romero argue that the district court erred in failing to grant a pre-trial motion to dismiss the January 6, 1992 indictment with prejudice for a conceded violation of the Speedy Trial Act. The district court dismissed Count One of that indictment, but did so without prejudice. Later that same day, the Government asked for, and the grand jury returned, the Indictment, which was identical to the third superseding indictment.
 
 
 21
 The Speedy Trial Act requires that any indictment charging an individual with the commission of an offense must be filed within thirty days from the date that individual was arrested. 18 U.S.C. Sec. 3161(b). Here, the Government conceded that there were unexcused delays of at most forty-two days for Rivera, fourteen days for Hoyos and thirty-one days for Romero. Rivera, Hoyos and Romero were arrested in late October and early November of 1990. All defense counsel agreed to continuances, and a Magistrate Judge entered orders of continuance, postponing for thirty days the time by which the Government was required to obtain an indictment. See 18 U.S.C. Sec. 3161(h)(8)(A). Subsequently, the Government--again with the consent of all defense counsel--requested several thirty-day extensions to the orders of continuance. The Magistrate Judge granted these extensions through April 1, 1991, the date on which Rivera, Hoyos and Romero finally were indicted for the first time. The unexcused delays can be traced to the procedure used by the Government to request the extensions to the orders of continuance. Apparently, although these requests were timely made, or were at most a few days late, the Magistrate Judge failed to act upon the requests when they were filed and in several instances delayed acting for more than two weeks. Since the continuances had expired in the interim, the delays attributable to the Magistrate Judge's inaction were not excludable under the Speedy Trial Act. See United States v. Tunnessen, 763 F.2d 74, 76-78 (2d Cir.1985). The district court found that these delays did not justify a dismissal of the indictment with prejudice.
 
 
 22
 The determination of whether to dismiss an indictment with or without prejudice is committed to the discretion of the district court, see United States v. Giambrone, 920 F.2d 176, 180 (2d Cir.1990), and we will reverse such a determination only upon a finding that the district court abused its discretion, see id. at 181. In determining whether to dismiss with or without prejudice, the Speedy Trial Act requires the district court to consider "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Speedy Trial Act] and on the administration of justice." 18 U.S.C. Sec. 3162(a)(2). In addition to these statutory factors, the Supreme Court has indicated that prejudice to the defendant should also be considered. See United States v. Taylor, 487 U.S. 326, 334, 108 S.Ct. 2413, 2418, 101 L.Ed.2d 297 (1988); United States v. Wells, 893 F.2d 535, 539-40 (2d Cir.1990). In evaluating the circumstances leading to the dismissal and the impact of reprosecution on the administration of the Speedy Trial Act and on the administration of justice, "the court may properly take into account a demonstrably lackadaisical attitude on the part of the government attorney in charge of the case or a pattern of dilatory practices on the part of the United States Attorney's office in the district in question." Giambrone, 920 F.2d at 180 (citing Taylor, 487 U.S. at 338-39, 108 S.Ct. at 2420); see also Wells, 893 F.2d at 539 (dismissal with prejudice may be appropriate where there is bad faith or a neglectful attitude on the part of the Government).
 
 
 23
 We find that the district court properly evaluated these factors in deciding that the dismissal should be without prejudice and did not abuse its discretion. First, the district court found that the narcotics charges were "very serious." See Taylor, 487 U.S. at 328, 338, 108 S.Ct. at 2415, 2420 (narcotics charges involving 400 grams of cocaine "serious"). Next, the district court considered the length of the unexcused delays and determined that these delays did not prejudice these appellants in any way. See Wells, 893 F.2d at 539-40 (32-day delay caused no prejudice). Indeed, these appellants had consented to the delays and cannot now complain that they were harmed by them. See United States v. Carrethers, 613 F.Supp. 185, 187 (S.D.N.Y.1985). The district court further determined that a dismissal with prejudice would not benefit the administration of the Speedy Trial Act. In particular, the district court found that the prosecutors assigned to the case had not exhibited a lackadaisical attitude toward the Speedy Trial Act, nor had the United States Attorney's office exhibited a pattern of neglect that would justify dismissal with prejudice. While we believe the Government bears some responsibility for the Speedy Trial Act violations, these violations were adequately redressed by requiring the Government to seek another indictment. See Taylor, 487 U.S. at 342, 108 S.Ct. at 2422. Finally, the district court found that the administration of justice would not be served by a dismissal with prejudice, since the case had been brought to trial "as promptly as the Court and the defendants [were] able."
 
 3. Search Warrant for Wilson's Apartment
 
 24
 Wilson argues that an affidavit submitted by Agent Cardiello in support of a warrant to search her home, issued on September 5, 1991, included false and misleading information. She also argues that the agents executing the warrant could not have relied upon it in good faith. Wilson's December 23, 1991 motion challenging the warrant was untimely, however. In an October 24, 1991 conference, the district court ordered that all defense motions be filed by December 2, 1991 and that suppression hearings would commence on December 18, 1991. Wilson did not object to the warrant before the deadline and accordingly has waived her right to challenge it. See Fed.R.Crim.P. 12(f). Moreover, Wilson has offered no reasonable excuse for her untimely objection that would justify relief from that waiver. See id.; United States v. Howard, 998 F.2d 42, 52 (2d Cir.1993).
 
 
 25
 4. Admission of Drug Records and False Identification Against Wilson and Ricardo Sanchez
 
 
 26
 We reject the arguments of Ricardo and Wilson that false identification documents for Ricardo and records of cocaine transactions seized in the September 5, 1991 search of their apartment constituted evidence of uncharged crimes that were unrelated to the conspiracies in this case and should not have been admitted at trial. The district court was well within its discretion in admitting these items. The drug records were, as the district court found, clearly relevant evidence of cocaine transactions made in furtherance of the conspiracy. See, e.g., United States v. Roldan-Zapata, 916 F.2d 795, 805 (2d Cir.1990) (narcotics records relevant to prove conspiracy), cert. denied, 499 U.S. 940, 111 S.Ct. 1397, 113 L.Ed.2d 453 (1991); United States v. Matos, 905 F.2d 30, 34 (2d Cir.1990) (same). Moreover, the use of false identification is relevant and admissible to show consciousness of guilt, see United States v. Morales, 577 F.2d 769, 772 (2d Cir.1978), and to show the means used in the conduct of the conspiracy, see United States v. Levy, 865 F.2d 551, 558 (3d Cir.1989) (en banc).
 
 5. Severance
 
 27
 a. Oscar Sanchez
 
 
 28
 Oscar contends that the large quantity of evidence presented at trial that was inapplicable to him caused a "prejudicial spillover," justifying a new trial. This argument is without merit. The decision whether to sever a defendant from a joint trial on grounds of alleged prejudice is committed to the sound discretion of the district court, United States v. Lasanta, 978 F.2d 1300, 1306 (2d Cir.1992), and a district court's decision to deny severance based on the likelihood of prejudicial spillover is "virtually unreviewable." Id. (quoting United States v. Cardascia, 951 F.2d 474, 482 (2d Cir.1991)). Oscar has offered no compelling reason why the district court should have severed the trial as to him, and we do not believe the district court abused its discretion in refusing to do so.
 
 
 29
 b. Romero
 
 
 30
 Romero moved prior to trial for severance so that Hoyos, his co-defendant, could testify on his behalf and renewed that motion toward the end of trial. The district court denied both of these motions. Romero argued that Hoyos' testimony would have (1) refuted evidence of cocaine sales made by Hoyos to Romero and (2) established that Hoyos' reference in a taped conversation to a person named "Colorado"--which the evidence showed was Romero's nickname--was to someone other than Romero. Romero submitted a declaration signed by Hoyos under penalty of perjury in which Hoyos stated that he would invoke his Fifth Amendment right to silence at his own trial, but would waive those rights and testify at Romero's trial if Romero were granted a separate trial.
 
 
 31
 In deciding whether to grant severance based on the defendant's need to call a co-defendant, a district court should consider "(1) the sufficiency of the showing that the co-defendant would testify at a severed trial and waive his Fifth Amendment privilege; (2) the degree to which the exculpatory testimony would be cumulative; (3) the counter arguments of judicial economy; and (4) the likelihood that the testimony would be subject to substantial, damaging impeachment." United States v. Finkelstein, 526 F.2d 517, 523-24 (2d Cir.1975), cert. denied, 425 U.S. 960, 96 S.Ct. 1742, 48 L.Ed.2d 205 (1976); accord United States v. Sliker, 751 F.2d 477, 496 (2d Cir.1984), cert. denied, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). The district court considered these factors in deciding to deny Romero's motions, and we do not believe this decision was an abuse of discretion. In particular, the district court found that, since Hoyos had not pleaded guilty, it was unrealistic to think that Hoyos would be any more willing to waive his privilege at a separate trial than at the joint trial; that Hoyos' willingness to testify was a last-minute ploy, particularly in light of his unwillingness to testify about who he meant by Colorado; and that Hoyos' testimony would be cumulative, given that Romero could have called any number of witnesses, including himself, who would state that he was not Colorado. Moreover, it is apparent that judicial economy concerns militate against severance in this case since Romero's conduct was closely intertwined with that of the other codefendants and virtually all of the same evidence would have to have been presented again at a separate trial of Romero. Finally, it is clear that substantially all of Hoyos' proffered testimony was subject to damaging impeachment in light of the evidence corroborating the case against Romero.
 
 6. Sentencing
 
 32
 All appellants except Rivera challenge the sentences imposed by the district court. We address the following arguments made by the appellants and find their other arguments with regard to sentencing to be without merit.
 
 
 33
 a. Ricardo Sanchez and Wilson
 
 
 34
 Ricardo and Wilson contest the district court's calculation of their base offense levels under the Sentencing Guidelines. The district court determined their base levels to be thirty-four, finding each to be responsible for at least fifteen kilograms of cocaine. See U.S.S.G. Sec. 2D1.1(c)(5). The district court made the following adjustments to these base offense levels: a four-level upward adjustment based on a finding that both Ricardo and Wilson were organizers or leaders of criminal activity involving five or more participants, see id. Sec. 3B1.1(a); a one-level upward adjustment for their employment of a minor, see id. Sec. 2D1.2(a)(2); and a two-level upward adjustment of Ricardo's offense level for obstruction of justice, see id. Sec. 3C1.1. The result was adjusted offense levels of forty-one for Ricardo and thirty-nine for Wilson. Both were in criminal history category I, which resulted in sentencing ranges of 324 to 405 months for Ricardo and 262 to 327 months for Wilson. The district court sentenced Ricardo to a prison term of 384 months, plus a five-year consecutive sentence for the charge of using a firearm during the commission of drug offenses, and sentenced Wilson to a prison term of 300 months. Ricardo and Wilson object to the district court's finding that they were accountable for more than fifteen kilograms of cocaine, and Ricardo contests the finding that he played a leadership role in the conspiracy.
 
 
 35
 For purposes of sentencing, "the amount of cocaine involved in an offense is an issue of fact which must be established by a preponderance of the evidence." United States v. Pirre, 927 F.2d 694, 696 (2d Cir.1991). The district court's findings in this regard are reviewed for clear error. Id. We find that the district court's determination that Ricardo and Wilson should be held accountable for fifteen kilograms of cocaine was amply supported by the evidence. Significantly, the district court found that the drug records of the conspiracy found in Ricardo's and Wilson's apartment alone established that Ricardo and Wilson were involved in the conspiracy to the extent of at least thirty kilograms of cocaine. See United States v. Schaper, 903 F.2d 891, 896-99 (2d Cir.1990) (district court erred in refusing to consider drug records connecting defendant to hundreds of kilos of cocaine beyond small amount actually seized); United States v. Robins, 978 F.2d 881, 890 (5th Cir.1992) (ledgers considered in proving amount of marijuana sales); United States v. Carper, 942 F.2d 1298, 1303 (8th Cir.) (records of drug sales used in calculating offense level), cert. denied, --- U.S. ----, 112 S.Ct. 614, 116 L.Ed.2d 636 (1991).
 
 
 36
 We reject Ricardo's argument that the district court erred in imposing a four-level upward adjustment in recognition of his leadership role in "a criminal activity that involved five or more participants or was otherwise extensive." U.S.S.G. Sec. 3B1.1(a). It cannot be disputed that both the distribution conspiracy and the importation conspiracy each involved five or more individuals, and the record is replete with evidence that Ricardo was the organizer or leader of at least five participants in each conspiracy. We therefore need not decide whether, as the Government contends, section 3B1.1(a) is applicable whenever five or more participants were involved in the criminal activity of which the defendant was an organizer or leader, regardless of how many the defendant personally organized or led. See United States v. Schweihs, 971 F.2d 1302, 1317-18 (7th Cir.1992) (section 3B1.1(a) applicable only where defendant personally organized or led five or more participants); United States v. Reid, 911 F.2d 1456, 1464-65 & n. 8 (10th Cir.1990) (same), cert. denied, 498 U.S. 1097, 111 S.Ct. 990, 112 L.Ed.2d 1074 (1991).
 
 
 37
 b. Oscar Sanchez
 
 
 38
 The district court found Oscar to be responsible for approximately two kilograms of crack distributed in the conspiracy, resulting in a base offense level of 38. See U.S.S.G. Sec. 2D1.1(c)(3). The district court applied a two-level enhancement for Oscar's possession of a gun during his offenses, and a two-level enhancement for obstruction of justice, resulting in an adjusted offense level of 42. See id. Secs. 2D1.1(b)(1), 3C1.1. Oscar's prior record put him in criminal history category III, resulting in a sentencing range of 360 months to life. The district court sentenced Oscar to a prison term of 384 months. Oscar argues that there was insufficient evidence to hold him accountable at sentencing for the loaded .25-caliber gun that was seized from his apartment during the search in November of 1990. This argument is without merit.
 
 
 39
 The commentary to the Guidelines explains: "The adjustment [provided by U.S.S.G. Sec. 2D1.1] should be applied if the weapon was present, unless it is clearly improbable that the weapon was connected with the offense." Id. Sec. 2D1.1, application note 3. Here, Oscar kept the loaded gun in the apartment where drugs were stored and the proceeds from drug sales kept. Although the evidence indicates that the last narcotics-related activity in the apartment took place in August of 1990, and the gun was seized some two-and-one-half months later, it was not error for the district court to find that, more likely than not, the gun was in the apartment during the period of drug activity. Moreover, even if the weapon was seized illegally, the district court was required to consider it if it was possessed during the commission of an offense. See United States v. Tejada, 956 F.2d 1256, 1262-63 (2d Cir.), cert. denied, --- U.S. ----, 113 S.Ct. 124, 334, 121 L.Ed.2d 80, 252 (1992).
 
 
 40
 c. Romero
 
 
 41
 The district court found that Romero was involved in the conspiracy to a lesser extent than the other defendants and that his relevant conduct in the conspiracy implicated only five kilograms of cocaine, resulting in a base offense level of 32. See U.S.S.G. Sec. 2D1.1(c)(6). Based on a criminal history category of I, Romero's sentencing range was 121 to 151 months, and the district court sentenced him to a prison term of 144 months to be followed by a five-year term of supervised release. Romero argues that the district court's finding that he was responsible for five kilograms of cocaine was clearly erroneous. We are unpersuaded.
 
 
 42
 The record shows that Romero was a regular customer of Ospina and regularly purchased cocaine from Ospina, Ricardo, Wilson and Rivera from the fall of 1989 until his arrest in October of 1990. Ospina began distributing cocaine to Romero on a weekly basis in November and December of 1989 in quantities ranging from 125 grams to two ounces. Romero argues that these quantities are not part of his relevant conduct because they occurred prior to the time the charged conspiracy began in January of 1990. We have consistently held, however, that in Guidelines cases involving charges of conspiracy, conduct occurring prior to the charged conspiracy may be considered relevant under section 1B1.3(a)(2) so long as it is part of the "same course of conduct." See United States v. Beaulieau, 959 F.2d 375, 378-79 (2d Cir.1992); United States v. Cousineau, 929 F.2d 64, 66-67 (2d Cir.1991). In this case, the evidence showed that these earlier purchases were part of a regular course of conduct between Ospina and Romero, and the district court did not clearly err in finding these transactions to be part of Romero's relevant conduct in the conspiracy.
 
 
 43
 The record further reveals that in March of 1990, Ospina purchased three kilograms of cocaine from Wilson, two of which he shared with Romero. Beginning in April of 1990, Ricardo and Wilson regularly supplied cocaine to Romero, including at least two sales of one pound of cocaine, totaling nearly a kilogram. Finally, in August though September of 1990, Rivera regularly supplied Romero with cocaine. There is specific evidence in the record of one sale of two ounces of cocaine during this period.
 
 
 44
 From the foregoing, the district court concluded that Romero was responsible for at least five kilograms of cocaine and that this amount was within the scope of his agreement with Ospina, even if Romero had not himself jointly or severally undertaken to deal with that quantity. We find that the record supports this conclusion. Even if the specific transactions identified in the record do not total five kilograms, they are merely examples of a course of conduct that continued unabated for an entire year, and they clearly support the district court's estimate that the total amount of cocaine attributable to Romero was in excess of five kilograms. See United States v. Colon, 961 F.2d 41, 43-44 (2d Cir.1992).
 
 7. Appellants' Other Arguments
 
 45
 Appellants raise various other arguments in challenging their convictions. We have carefully reviewed these arguments and find them to be without merit.
 
 CONCLUSION
 
 46
 In accordance with the foregoing, the judgments of conviction and sentence are affirmed.