**UNITED STATES of America**

v.

**David RIVERA, a/k/a "Daul," Defendant.**

**No. 98 CR. 537(AGS).**

United States District Court,
S.D. New York.

Oct. 21, 1998.

Paul Radvany, Maria Horn, John M. Hillebrecht, Assistant U.S. Attorneys, U.S. Department of Justice, U.S. Attorneys Office, Southern District of New York, NY, for Plaintiff.

Elizabeth Fink, Daniel Meyers, Brooklyn, NY, for Defendant.

## OPINION & ORDER

SCHWARTZ, District Judge.

In a one count indictment, the Government charges defendant David Rivera with conspiracy to distribute and possess with intent to distribute a controlled substance in violation of 21 U.S.C. §§ 812, 841(a)(1), and 841(b)(1)(A). Defendant has moved to dismiss the indictment with prejudice on the grounds that the Government has failed to comply with the speedy trial provisions of the Sixth Amendment and 18 U.S.C. §§ 3161(b) and 3162(a)(1). For the reasons set forth below, defendant's motion is granted.

## FACTS

The facts material to defendant's motion appear, for the most part, to be undisputed.

In December 1996, New York Drug Enforcement Task Force agents arrested numerous members of the "Watson Avenue Family," a group of individuals who sold heroin in the vicinity of Watson and Elder Avenues in the Bronx. One of those arrested was defendant's brother, Israel Rivera, who, according to the Complaint, was known as "Daul." (Sealed Compl. in *United States v. Castellano* ("Castellano Compl."), 96 Mag. 2321.) Subsequent to the arrest, the agents learned that "Daul" was, in fact, a name used by defendant David Rivera (Hearing Tr. at 149); accordingly, Israel Rivera was released from custody.

In addition, in December 1996, a defendant in *Castellano* informed the agents that "Daul" was serving in the United States Army Reserves. (Sealed Compl. in the instant action ("Compl.") ¶ 8.) By a date no later than March 1997, the Government was aware that defendant David Rivera had been activated to full duty in the Army, and was serving in Hungary as part of the Bosnia campaign. (*Id.* at ¶¶ 10, 11; Hearing Tr. at 149–52 (test. of AUSA Hillebrecht).) Mr. Rivera was not arrested until October 23, 1997,[1] (Docket Sheet at 2), when he arrived at Atlanta Airport after finishing his tour of duty in Europe, (Affirmation of Elizabeth M. Fink ("Fink Aff.") ¶ 2).

On November 4, 1997, Mr. Rivera was brought to Westchester County Jail ("Valhalla"). (*Id.* at ¶ 4.) On November 7, 1997, he was arraigned before a magistrate judge. (*Id.* at ¶ 5.) On that date, an attorney, Elizabeth Fink, Esq., was assigned Mr. Rivera's case pursuant to the Criminal Justice Act. (*Id.* at ¶ 6.) In early December 1997, John Hillebrecht, the Assistant United States Attorney assigned to the case, spoke by telephone with Ms. Fink, who agreed to a one month continuance, from December 8, 1997 to January 7, 1998, in order to consider the Government's request that Mr. Rivera cooperate in a separate RICO investigation. (*Id.* at ¶ 11.) Magistrate Judge Ronald L. Ellis entered an Order of Continuance on December 8, 1997.

---

1. In the interim, in May 1997, all of Mr. Rivera's co-defendants had entered guilty pleas pursuant to a global plea agreement with the Government. (*United States v. Acosta,* 96 cr. 1040.) Thus, with the exception of prosecuting Mr. Rivera, the Government had effectively completed this phase of its investigation into the Watson Avenue Family, which it considered "a major street-level heroin distribution organization." (Castellano Compl. ¶ 5.)

On January 7, 1998, the AUSA on "calendar duty" advised Magistrate Judge Sharon E. Grubin that plea discussions were ongoing and that the defendant consented to an additional 30–day adjournment. Based upon the AUSA's representations, Magistrate Judge Grubin continued the case until February 6, 1998. The same scenario was repeated before Magistrate Judge Andrew J. Peck on February 6th, Magistrate Judge Michael H. Dolinger on March 9th, and Magistrate Judge Douglas F. Eaton on April 8th. On May 8, 1998, based upon the AUSA's representation that she had defendant's consent and that "serious plea discussions are continuing," Magistrate Judge Theodore H. Katz granted an additional 30–day continuance, but stated that no further adjournments would be granted without a detailed affidavit. On June 8, 1998, the AUSA informed Magistrate Judge Grubin that he had defendant's consent to a further 30–day continuance and that "a plea agreement has been negotiated; the parties are working to finalize that agreement." Magistrate Judge Grubin dismissed the complaint for failure to comply with Magistrate Judge Katz's order.[2]

In point of fact, however, defense counsel had consented only to the original adjournment until January 7, 1998. AUSA Hillebrecht did not, thereafter, obtain explicit consent from Ms. Fink to any further continuance. (Affirmation of John M. Hillebrecht ("Hillebrecht Aff.") ¶ 9.) Subsequent to the initial continuance, Ms. Fink never, orally or in writing, consented to a further adjournment. She was never informed of, nor was she present on, any of the dates on which the case appeared on the calendar in Magistrate's Court. Nor did Ms. Fink receive notice of the continuances that were granted, despite notations on the docket sheet indicating that copies were mailed. (Letter from AUSA Maria P. Horn dated Oct. 1, 1998.) As is discussed *infra*, there is also considerable question as to the accuracy of the statements made by the Government to the magistrate judges on the May and June calendar days regarding the status of plea negotiations.

Mr. Rivera filed the instant motion on August 17, 1998. The Court, on September 25, 1998, set this motion down for a hearing. On October 6th and 7th, the Court heard testimony from Ms. Fink, AUSAs John Hillebrecht, Jamie Kogan and Paul Radvany; Mr. Rivera and his mother, Carmen Garcia de Palar; and Betty Villano, Supervisory Paralegal Specialist in the U.S. Attorney's Office. The Court also heard oral argument on the motion on October 14, 1998.

## DISCUSSION

The Speedy Trial Act ("the Act") requires that "any information or indictment charging an individual with the commission of an offense shall be filed within thirty days from the date on which the individual was arrested or served with a summons in connection with such charges." 18 U.S.C. § 3161(b). The Act provides that this time may be extended "if the judge granted such continuance on the basis of his findings that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial." 18 U.S.C. § 3161(h)(8)(A). In granting an extension under § 3161(h)(8)(A), the court must state its reasons, either orally or in writing, for finding that the continuance is warranted. *Id.* If an indictment is not filed within the time limit required by § 3161, the charges against that individual "shall be dismissed or otherwise dropped." 18 U.S.C. § 3162(a)(1).

In the instant matter, the magistrate judges who granted the continuances were told that defendant had consented to the request, when in fact he had not. AUSA Hillebrecht admits that he had not obtained Ms. Fink's explicit consent, but rather had made certain assumptions:

> Based on the conversation with Ms. Fink [during which Ms. Fink agreed to the original adjournment], as well as subsequent conversations that I or AUSA Jamie Kogan had with Ms. Fink, I believed in each instance that I accurately and truthfully represented to the Court that the defendant desired the Government to defer indictment until he decided how he wished to proceed and that he consented to each

2. The Government indicted Mr. Rivera the following day, June 9, 1998.

adjournment with a view towards reaching that goal.

(Hillebrecht Aff. ¶ 5.)

I believed that the defendant had consented to a continuance pending a decision as to whether or not to cooperate or enter a plea pursuant to the terms of the global plea. Based on that belief, I failed to ask expressly whether the defendant consented to each and every additional thirty days as the various continuances were nearing their end.

(*Id.* at ¶ 9.)

It would also appear that the magistrate judges were misinformed as to the existence and/or progress of plea negotiations. At the very least, as we discuss more fully *infra,* the representations made by the AUSAs at the May and June calendar days exaggerated the significance of any discussions which were then taking place.

■ The magistrate judges granted the adjournments in question based solely upon the information provided to them by the AUSA on calendar duty. Each finding that adjournment served the ends of justice was based upon erroneous information as to defendant's consent and the state of plea negotiations. These findings are therefore invalid, and the adjournments improper. The Court finds that, in light of the invalidity of the adjournments, more than thirty days of non-excludable time elapsed from the time of Mr. Rivera's arrest to the time of his indictment, and that the indictment must therefore be dismissed pursuant to 18 U.S.C. § 3162(a)(1).

Having decided that the indictment is to be dismissed, the Court now must determine, in its sound discretion, whether the dismissal is to be with or without prejudice. *See United States v. Wilson,* 11 F.3d 346, 352 (2d Cir. 1993). The Speedy Trial Act requires that we consider "the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of [the Act] and on the administration of justice." 18 U.S.C. § 3162(a)(1). In addition to these factors, "the Supreme Court has indicated that prejudice to the defendant should also be considered." *Wilson,* 11 F.3d at 352 (citing *United States v. Taylor,* 487 U.S. 326, 334, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988)).

It is undisputed that Mr. Rivera is charged with a serious offense, i.e., conspiracy to distribute heroin. Although his counsel alleges prejudice to the defendant as a result of the lengthy delay in indictment, in fact the "prejudice" referred to (i.e., he is unemployed as a result of his arrest and incarceration, and is unable to help support his mother or to resume his military career (Hearing Tr. at 274 (test. of David Rivera))), is not of the type typically contemplated by courts which have interpreted and applied *Taylor.* "Prejudice," in this context, is generally limited to a negative effect on a defendant's ability to mount a defense. *See,* e.g., *Patiwana v. United States,* 928 F.Supp. 226, 240 (E.D.N.Y.1996).

■ The facts and circumstances of this case, on the other hand, present entirely different, and more serious, considerations which argue strongly for dismissal with prejudice. The picture which emerged over the course of the two days of hearings held by the Court is one of, at best, governmental indifference or, at worst, deliberate delay on the part of the Government in hopes of inducing cooperation on the part of Mr. Rivera in a contemplated RICO action involving a number of alleged murders.

As is detailed *supra,* the Government knew no later than March 1997 that Mr. Rivera was "Daul," and that he was serving in the Armed Forces. The Government, which had exclusive control over Mr. Rivera, chose not to bring him back to the United States to face trial with his co-defendants. Instead, the Government waited to arrest Mr. Rivera until his tour of duty ended in October 1997. By this time, Mr. Rivera's co-defendants had made their plea bargains with the Government, and had been sentenced accordingly.

Mr. Rivera was arrested in Georgia on October 23, 1997.[3] He was not brought to

---

**3.** Ms. Fink, in her affirmation, states that Mr. Rivera was arrested on October 22nd. (Fink Aff.

¶ 2.) The Court will rely upon the docket sheet entry showing that Mr. Rivera was arrested on

New York until November 4th. (Fink Aff. ¶ 4.) Twelve days is an inordinate amount of time to transport a detainee from one district to another. The Speedy Trial Act itself states that any delay of greater than ten days is presumed to be unreasonable. 18 U.S.C. § 3161(h)(1)(H). *See also United States v. Jervey*, 630 F.Supp. 695, 697 (S.D.N.Y.1986) (transportation time in excess of ten days will not be excluded from speedy trial calculation, even where circumstances mandate time-consuming trip). Three additional days elapsed before Mr. Rivera was brought before a magistrate judge for arraignment. (Docket Sheet at 2.) Thus, a total of fifteen days passed from the time of Mr. Rivera's arrest until he was brought before a judicial officer. It is apparent that, at the very least, the Government did not proceed as expeditiously as it might have.

Following arraignment, it is undisputed that Ms. Fink, on Mr. Rivera's behalf, consented to the initial thirty day adjournment until January 7, 1998. It is also undisputed that Ms. Fink never again was asked for or gave explicit consent to additional adjournments. The Government advances three arguments in support of its position that the indictment, if it is to be dismissed at all, should be dismissed without prejudice: that AUSA Hillebrecht justifiably relied upon ongoing plea negotiations in believing that he had Ms. Fink's implicit consent to the adjournments; that there was no bad faith on the part of the Government; and that Ms. Fink was well aware of the passage of time, deliberately said nothing, and then "sandbagged" the Government with her motion to dismiss. We examine each argument in turn.

We note initially that the Government offers no support for the proposition that consent to an adjournment can be given implicitly (i.e., by conduct). The Court need not address this issue, however, because we find that it was not reasonable for AUSA Hillebrecht to regard his intermittent and non-

specific negotiations with Ms. Fink as evidencing any sort of consent on her part to multiple adjournments. Having heard testimony from Ms. Fink and AUSAs Hillebrecht and Kogan,[4] the Court finds that whatever discussions may have taken place do not rise to the level of "ongoing plea negotiations" which would justify the exclusion of time under the Speedy Trial Act.

There is some dispute as to the number of conversations which took place between Ms. Fink and the two AUSAs subsequent to the initial adjournment. According to Ms. Fink, she spoke with AUSA Kogan in late January 1998 in regard to discovery matters; spoke with one of the two AUSAs in late March or early April in regard to Mr. Rivera's possible cooperation in the RICO investigation; and spoke with both AUSAs in late April on a telephone conference about a possible plea. (Hearing Tr. at 31–34.) AUSA Hillebrecht, on the other hand, testified to "numerous conversations with Ms. Fink," (*id.* at 105), although he could recall only five with any specificity,[5] (*id.* at 106–18). He agrees that his contact with Ms. Fink, except for one occasion when they met, was limited to telephone conversations. AUSA Kogan's testimony was consonant with that given by Ms. Fink. (*Id.* at 205–09.)

We need not attempt to resolve the conflicting testimony, because it is the content of the conversations that is dispositive here, not the quantity. Based upon the testimony presented, the Court finds the following scenario: Ms. Fink indisputably agreed to a 30–day continuance until January 7, 1998, during which time Mr. Rivera would not be indicted and the Government would provide defendant with certain discovery. A period of time then passed during which AUSA Hillebrecht was under the impression that defendant was weighing his options. Ms. Fink had a conversation in late March or early April 1998 with either AUSA Hillebrecht or AUSA Kogan during which the Government

---

October 23rd. In any event, the minor discrepancy is not material.

**4.** Although this matter was primarily assigned to AUSA Hillebrecht, AUSA Kogan also worked on the case until April 1998 when she left on maternity leave.

**5.** He maintained no log or record or memorandum of the dates, subject matter or content of any of the conversations. (Hearing Tr. at 141.)

solicited Mr. Rivera's cooperation in the RICO investigation. Another period of time passed during which the Government awaited Ms. Fink's response, although her recollection is that she had told the Government that she would get back to them if her client was interested in cooperating. (Hearing Tr. at 32.) In late April, Ms. Fink had a telephone conference with both AUSAs during which she rejected the possibility of cooperation, and was asked whether her client would be interested in a global plea. (*Id.* at 33.) The Government thereafter provided Ms. Fink, by fax, with a copy of the global plea in *Castellano*. (*Id.* at 34.)

The Court also finds that no conversations took place which might properly be regarded as serious discussions regarding cooperation and/or serious or substantive plea negotiations. According to AUSA Hillebrecht's testimony, he never met face to face with Ms. Fink or Mr. Rivera, never specified the quantity of drugs with which Mr. Rivera would be charged or the guideline level, range of imprisonment or other material elements of the plea offer ·that would apply to defendant, never drafted a proposed plea agreement specific to Mr. Rivera, never discussed with Ms. Fink a safety valve proffer, never set a time limit during which a proposed plea was to be accepted, and never received an alternative plea proposal from Ms. Fink. (Hearing Tr. at 173–82.) He also never agreed to consider dismissing the charges against Mr. Rivera, and rejected the possibility of any sort of bail package until after defendant had been in custody for nine months and had notified the Court of his intention to file the instant motion. (*Id.* at 32–33.) In addition, AUSA Hillebrecht told defense counsel, in regard to the global plea, only that Mr. Rivera would be regarded as having been at a "lower level" of the organization (not the lowest), without ever defining what that term meant. (*Id.* at 177.)

AUSA Hillebrecht's belief that Mr. Rivera consented to repeated monthly adjournments because discussions had taken place with reference to a possible plea was not reasonable. The defense raises the issue of possible bad faith on the part of the Government. As to the monthly adjournments in Magistrate's

Court from January through April, we find that AUSA Hillebrecht's honest, though mistaken, belief as to consent precludes a finding of bad faith. The requests for adjournments in May and June (the former granted, the latter denied) are more problematic. In regard to the earlier adjournments, the AUSA on calendar duty had represented to the magistrate judges only that plea discussions were on-going. In May, concededly after Ms. Fink had rejected any proposed cooperation (and during a period when no contact or negotiations between counsel was taking place), the AUSA in Magistrate's Court stated that "serious plea discussions are continuing," and in June that "a plea agreement has been negotiated; the parties are working to finalize that agreement."

The Court finds it disturbing that, as the number of adjournments requested mounted, the AUSAs may have sought to give the impression to the court that progress was being made in negotiations. The June representation, in particular, deviates dramatically from the truth. Nonetheless, we are willing to accept the Government's representation that the language used in the June statement resulted from miscommunication and/or inadvertent misstatement. (Summations Tr. at 38–40.) The Court therefore finds that defendant has failed to make a showing of bad faith on the part of the Government.

Such a showing, however, is not necessary to support a dismissal with prejudice. The Supreme Court instructs that courts may also consider "a truly neglectful attitude on the part of the Government." *United States v. Taylor,* 487 U.S. 326, 338, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988). *See also United States v. Giambrone,* 920 F.2d 176, 180 (2d Cir.1990) ("[T]he court may properly take into account a demonstrably lackadaisical attitude on the part of the government attorney in charge of the case . . . .").

Dismissal with prejudice is a drastic remedy. Had the instant matter occurred in isolation, the Court might have hesitated to characterize the Government's actions as so neglectful as to merit the extreme sanction of dismissal with prejudice. However, almost a year ago and shortly prior to the arraignment of Mr. Rivera in Magistrate's Court in

the Southern District, Judge Cote of this Court issued an opinion in *United States v. Fajardo,* No. 97–cr–614, 1997 WL 669862 (S.D.N.Y. Oct.28, 1997), based upon facts remarkably similar to those at bar. In that opinion, the Court strongly criticized the Government for the procedures followed in obtaining adjournments in Magistrate's Court:

> The Court finds the approach to the requirements of the Speedy Trial Act exhibited in this case deplorable. The pro forma procedure the Government appears to have adopted with respect to continuances demonstrates a reckless disregard for the rights of both the public and individuals who have been arrested, in particular those who have been detained without indictment. By literally rubber-stamping the Government's requests for continuances in this case with the words of the Act, there has arguably been compliance with the letter of the law but certainly not with its spirit. Although the Court need not reach whether the procedure followed in this case violates the Act—particularly when repeated for months at a time, without particularized findings, and without any direct participation by a defendant either through an appearance before a Magistrate Judge or through a written waiver of his or her rights under the Act— the Government should be forewarned that these procedures for extending the time under the Act are cause for grave concern.

*Fajardo,* 1997 WL 669862, at *4.

In response to *Fajardo,* the Government made certain changes in its internal procedures.[6] After *Fajardo,* AUSAs were required to seek approval at a higher level than previously for extension requests and, after six months, were required to obtain approval from the Chief of the Criminal Division.

(Summations Tr. at 17–18; Hearing Tr. at 137.) The Court has serious reservations as to whether these changes adequately addressed the "grave concern" expressed by Judge Cote. In any event, AUSA Hillebrecht did not comply with these revised procedures:

> During that period of time, quite frankly, I had forgotten that policy existed, and I did not comply with the policy.... I did not seek the approval from my unit chief for these extensions, no, and didn't receive it.

(Hearing Tr. at 137.)

In sum, the Court finds that the Government's handling of this matter evidenced, at best, the "demonstrably lackadaisical attitude" condemned by the Second Circuit in *Giambrone* and subsequent cases. We note, in particular, the delays in apprehending Mr. Rivera, transporting him to New York, and producing him for arraignment; the repeated misrepresentations made to magistrate judges in regard to Mr. Rivera's consent to adjournments and the status of plea discussions; and Magistrate Judge Grubin's dismissal of the complaint in light of the Government's failure to have complied with Magistrate Judge Katz's directive. The Court also notes that the Government's inattention to detail extended through the briefing of the current motion, as detailed *infra.*

We turn next to the question of Ms. Fink's role in the delay in indicting her client. The Government maintains that Ms. Fink was well aware of the passage of time, deliberately remained silent, and then "sandbagged" the Government with a motion to dismiss. Obviously, Ms. Fink, an experienced criminal defense attorney, knew that time was passing and that the Speedy Trial clock was running. According to her testimony, however, she was unaware that the Government was re-

---

**6.** The Government has made additional changes in the wake of this matter. In a letter dated October 5, 1998, Mark F. Pomerantz, Chief of the Criminal Division, informs the Court that

> All AUSAs will now be required to provide the calendar Assistant with some writing confirming that the defense has consented to any continuance that would extend the indictment deadline more than 90 days from the date of the defendant's first appearance in this District. Unless a writing exists, the AUSA han-

> dling the case will appear in person before the Magistrate Judge to provide a satisfactory basis for an extension of a continuance order. Also, I have reminded AUSAs that they must obtain the explicit, specific consent of the defense attorney for all extension requests that are made "on consent," and that they should not rely on the pendency of plea discussions or a general request not to indict the defendant as a substitute for specific consent.

questing and obtaining continuances premised upon her consent. Ms. Fink testified that she was aware of the *Fajardo* decision as soon as it came down, and that she had assumed that the Government had changed its procedures for rolling over cases (i.e., that it no longer used the "blueback method"[7] of pro forma rollovers). (Hearing Tr. at 85.) In her summation, Ms. Fink stated, in essence, that she assumed that AUSA Hillebrecht had simply forgotten about the case. (Summations Tr. at 5.)

The Government introduced no evidence that Ms. Fink was aware of the rollovers. In his affirmation in this matter, AUSA Hillebrecht did state that

> I know that it is standard practice in this District to mail to the parties copies of each order extending such adjournments. The docket sheet in this case indicates that copies of each order at issue here were mailed to defense counsel.

(Hillebrecht Aff. ¶ 7.)

Subsequently, however, by letter dated October 1, 1998, AUSA Maria P. Horn informed the Court that

> Since that time [the time of AUSA Hillebrecht's affirmation], we have made further inquiry and learned that, although it is the practice of this Office to mail out copies of the initial order of continuance, it is not the practice of this office to mail out notice of extensions of such continuances, nor is it the practice of the Magistrate Clerk's office to do so, in spite of the fact that the docket sheet maintained by the Magistrate's Court indicates otherwise.

The Court finds that, although Ms. Fink clearly knew that the case was pending and had regular telephone contact with her incarcerated client and may have taken advantage of the Government's laxity, she was under no obligation to assist the Government in doing its job, particularly where the Government

had, at the outset, rejected her requests that her client be granted bail and that the Government consider not indicting the defendant in order that he might resume his career in the military.

In sum, the Court finds that the facts and circumstances leading to the dismissal of this action weigh heavily in favor of dismissal with prejudice. We turn finally to the impact of a reprosecution on the administration of the Speedy Trial Act and on the administration of justice. We are mindful of the Supreme Court's admonition that

> It is self-evident that dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays. Nonetheless, the Act does not require dismissal with prejudice for every violation. Dismissal without prejudice is not a toothless sanction ....

*United States v. Taylor,* 487 U.S. 326, 342, 108 S.Ct. 2413, 101 L.Ed.2d 297 (1988).

In light of the particular circumstances of this case, however, coupled with the Government's less than dramatic response to Judge Cote's strong language in *Fajardo,* the Court notes the testimony given by then Assistant Attorney General William H. Rehnquist in a Senate hearing on the Act:

> It may well be, Mr. Chairman, that the whole system of federal criminal justice needs to be shaken by the scruff of its neck, and brought up short with a relatively peremptory instruction ... that criminal cases must be tried within a particular period of time.

A. Partridge, *Legislative History of Title I of the Speedy Trial Act of 1974* 17 (1980).

We also take note of the views expressed by Judge Brieant of this Court:

> Betty Villano, Supervisory Paralegal Specialist in the U.S. Attorney's Office, testified that she always notifies AUSAs when their cases are scheduled in Magistrate's Court. (Hearing Tr. at 312.) She very rarely gives defense counsel notice (perhaps two or three times a year), and only when there is a problem, such as the unavailability of the AUSA. (*Id.*)

7. The calendar in Magistrate's Court is prepared by the Government. A copy of the *initial* order of continuance is forwarded to defense counsel. Thereafter, the practice is to have the Magistrate Judge endorse the blue back indicating the further continuance. No order or other document is provided to defense counsel either as to the fact of the continuance or as to the adjourned date.

When, as often occurs, trial courts simply dismiss counts without prejudice for violation of the Speedy Trial Act, so as to permit the Government to reprosecute the claim simply by obtaining a new indictment, we participate in a charade.

*United States v. Jervey,* 630 F.Supp. 695, 698 (S.D.N.Y.1986).

While it may be argued that the mere fact of this action has already shaken the Government and led to positive changes in procedure, the Court believes that, in light of *Fajardo,* a stronger message than a dismissal without prejudice is required. We therefore find that factors concerning the administration of the Act and of justice weigh strongly in favor of a dismissal with prejudice.

Having considered the four factors established by the Speedy Trial Act and the Supreme Court, the Court finds that dismissal of this action with prejudice is warranted. The Clerk of the Court is directed to dismiss all open counts against defendant with prejudice. The Clerk shall thereafter close the file in this action.

SO ORDERED.