Rajan PATIWANA, Petitioner,

v.

UNITED STATES of America,
Respondent.

No. 93 CV 0846 (FB).

United States District Court,
E.D. New York.

June 7, 1996.

Michael E. Deutsch, New York City, for petitioner.

Zachary W. Carter, United States Attorney, Eastern District of New York by An-

drew Hinton, Assistant United States Attorney, Brooklyn, New York, for respondent.

### MEMORANDUM AND ORDER

BLOCK, District Judge:

In 1990, petitioner Rajan Patiwana ("Patiwana") was convicted after trial by jury on one count of conspiracy to possess with intent to distribute heroin in violation of 21 U.S.C. § 846 and one count of possession with intent to distribute heroin in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2 (the "1990 convictions"). He had previously been convicted for these crimes in 1987, but the Second Circuit reversed and remanded for retrial. *See United States v. Tussa,* 816 F.2d 58 (2d Cir.1987). Patiwana challenges the legality of his 1990 convictions in this *habeas corpus* proceeding pursuant to 28 U.S.C. § 2255. He claims that he was deprived of his Sixth Amendment right to effective assistance of counsel because his trial attorney, Jack Litman ("Litman"), labored under an actual conflict of interest and provided ineffective assistance of counsel by failing to move to dismiss the indictment under the Speedy Trial Act, 18 U.S.C. §§ 3161 *et seq.* (the "Act"), notwithstanding the lapse of some thirty-seven months from the issuance of the mandate to his retrial.[1]

### I. BACKGROUND

#### A. Procedural History.

This case has a lengthy procedural history, encompassing two jury trials, two appeals to the Second Circuit, the present collateral attack, and the energies of numerous federal judges and Assistant United States Attorneys over the course of eleven years. Patiwana was arrested for these crimes on March 13, 1985. Later that year, following a jury trial in the United States District Court for the Eastern District of New York before Judge Herbert N. Maletz,[2] Patiwana was convicted and sentenced to a twelve-year prison term (the "1985 convictions"). In its reversal, the Second Circuit held, *inter alia,* that the admission at trial of hearsay testimony of an informant's statement was improper and not harmless error. *Tussa,* 816 F.2d at 67. The Second Circuit's mandate was issued on June 3, 1987.

Despite the Act's prescription that a retrial must commence within seventy days, *see* 18 U.S.C. § 3161(e), Patiwana's retrial did not commence until July 9, 1990—approximately thirty-seven months later.[3] After a jury trial before Judge Joseph M. McLaughlin, Patiwana was again convicted on both counts and again appealed to the Second Circuit. In this appeal, he claimed, *inter alia,* that the delay between the Second Circuit's remand and the second trial violated his statutory right to a speedy trial. In an unpublished decision, the Second Circuit affirmed, holding in that respect that petitioner had waived the claim by not raising it prior to trial. *United States v. Spatola,* 935 F.2d 1277 (2d Cir. 1991); (Gov't Ltr.–Mem. dated October 31, 1995, Ex. 2) (hereafter "Gov't Ltr.–Mem.").[4]

---

1. Patiwana is presently under supervisory release and facing deportation proceedings as a result of the 1990 convictions.

2. Senior Judge of the United States Court of International Trade, sitting by designation.

3. Patiwana was free on bail for nearly the entire period of delay.

4. Patiwana also claimed that his constitutional right to a speedy trial had been violated. Applying the four factor test of *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Second Circuit stated, as follows:

> Although the length of the delay in this case raises concern, "delay alone is insufficient to constitute a Sixth Amendment violation." *United States v. New Buffalo Amusement Corp.,*

600 F.2d 368, 372 (2d Cir.1979). An analysis of the other three factors does not reveal any violation of Patiwana's constitutional speedy trial rights. (1) Virtually all the delay was caused not by the government but by defense counsel's filing of motions and other relevant proceedings, as well as his requests for extensive continuances because of conflicts with another trial. (2) That Patiwana never asserted his right at any time prior to his trial weighs heavily against him. *See United States v. Lane,* 561 F.2d 1075, 1079 (2d Cir.1977). (3) Patiwana was not prejudiced. His claims that during the delay period his liberty was unduly hampered and that he suffered emotionally do not justify dismissal, nor is there any indication that his defense at trial was adversely affected by the lapse of time.

*Spatola,* No. 90–1632, slip op. at 2; (Ex. 2).

It is this same delay which is the gravamen of petitioner's *habeas corpus* petition.

Because of the extensive retrial delay, the Court held a hearing.[5] Based on the facts adduced at the hearing and the parties' written submissions, the Court concludes, after a searching analysis of the circumstances impacting upon Patiwana's statutory speedy trial rights in the context of his Sixth Amendment right to effective assistance of counsel, that his petition should be denied.

## B. The Three Year Delay.

The delay in this case can be broken down into two broad categories: 1) an initial period in which Litman was largely unavailable for trial; and 2) a later period in which the government delayed the trial and defense counsel failed to object.

### 1. Period One—Unavailability of Defense Counsel.

After consulting with Nathan Dershowitz, Patiwana's counsel for his first appeal, Patiwana hired Litman to represent him for his retrial. (Tr. II at 198–99.)[6] According to Patiwana, he stressed from the outset of his relationship with Litman that he wanted to be retried "as soon as possible" and that he did not like being "in limbo." (Tr. I at 59, 71.) According to Dershowitz, there were two reasons for this attitude: first, Patiwana

"really wanted to be vindicated"; second, they both believed that a favorable disposition was more likely if it appeared that they were "pushing" to go to trial. (Tr. II at 198.)

Litman, however, was unable to proceed immediately because of commitments to other clients, most notably Robert Chambers, who he was defending in the highly publicized "preppie murder" case. (Tr. II at 143.) In fact, Litman was essentially unavailable from the date of the mandate through the Fall of 1988, a period of almost 15 months, during which he conducted the pretrial hearings in the Chambers case (May—July 1987), tried a case in federal court in New Jersey (August—October 1987), selected the jury in the Chambers case (mid-October 1987), tried the Chambers case (January—March 1988), and tried and retried a murder case in Brooklyn (Spring 1988, Fall 1988). (Tr. II at 144–46, 151–53.)[7] Although Litman acknowledged that Patiwana may have initially desired a quick retrial, his view was that Patiwana made a choice to forego expeditious retrial in order to have Litman available as his counsel. (Tr. II at 145, 170–71.)[8]

On three occasions during this initial period, time was excluded by Judge Mark Costantino without any ends-of-justice analysis, a signed speedy trial waiver or record consent by Patiwana. (Gov't Ltr.–Mem., Ex. B) (July 22, 1987 to September 16, 1987) (Court

---

5. The hearing was held on July 18, August 22, and August 25, 1995.

6. Citations to "Tr. I" and "Tr. II" are references to the transcripts of the hearing. "Tr. I" covers the July 18, 1995 proceedings (Tr. I at 1–155); "Tr. II" covers the August 22, 1995 (Tr. II at 1–190) and August 25, 1995 (Tr. II at 191–270) proceedings.

7. THE COURT: Would it be fair for me to conclude that from the date of the issuance of the mandate, which I understand was on June 3rd, 1987, just to refresh your possible recollection, throughout the ensuing year into '88, and perhaps beyond, that you were basically involved with other trials which did not allow you to try this case, or to retry this case?

   MR. LITMAN: Well, there were certainly periods, Your Honor—it wasn't every day. . . .

\* \* \* \* \* \*

THE COURT: I'm just trying to get your best opinion without having to go through the nitty gritty of every date in your trial calendar.
MR. LITMAN: I would think that would be fair, although you could also say it would be fair that we could have tried the case in the summer of 1988, because I'm pretty sure we were not on trial in the summer of 1988.

(Tr. II at 152–53.)

8. Litman testified that "[Patiwana] said that he wanted me to be the lawyer to try the case." (Tr. II at 159.) Similarly, Litman's law partner testified that "Rajan was adamant from the beginning that Jack Litman try the case. That's what he wanted." (Tr. II at 16.)

agrees that it will exclude the time due to the appointment of new counsel for co-defendant); (Gov't Ltr.–Mem., Ex. C) (September 16, 1987 to November 4, 1987) (Court sets trial date for November because Litman unavailable; states only that "this is in the interest of justice"); (Gov't Ltr.–Mem., Ex. D) (November 4, 1987 to January 21, 1988) (Litman still unavailable; defense counsel represents that speedy trial is waived by everyone involved; Court says, "All right.").

## 2. Period Two—The Government's Failure to Push Forward and the Defendant's Strategy of Delay.

The second period is characterized by a lackadaisical attitude by the government and a willingness by the defense during the middle-end of 1988 to acquiesce in continued delay. According to Russell Gioiella ("Gioiella"), Litman's law partner, as time passed the defense began to view delay as beneficial:

> [Initially], we all just assumed [the case] was going to be tried soon, because that's generally what happens when there's a reversal. As time went on, and it became apparent that this was a case that you could delay, that's when we started to think: hey, this could be to [Patiwana's] benefit.

(Tr. II at 46.) Gioiella testified that he had several conversations with Patiwana

> about the fact that it seemed to [Litman and Gioiella] that his ultimate goal could be helped by a delay, that the longer that he was out, living a law-abiding life with Maria [Brodsky], and basically staying out of trouble, the better chance he would have, ultimately, if he were convicted, to either get a lesser jail sentence and/or avoid deportation because the INS does have the discretion in those instances. They don't have to deport you.
>
> And also, we were always hoping against hope that we'd be able to work something out with the Government where he could plead to something that would be a non-controlled substances violation.

(Tr. II at 18–19.) Litman similarly testified that he and Gioiella realized

> at some point, the longer the case, after a certain period, was delayed, that the better

off it may be for [Patiwana], because the track record he would show as an excellent human being, an extraordinarily good companion to Ms. Brodsky, an extraordinary surrogate father to two boys, would be taken into account either by a prosecutor resolving the case; by a judge in recommending, even though a federal judge didn't have the power; and by INS in just deciding to exercise its discretion not to seek deportation.

(Tr. II at 148–49.)

During this second period, it was clear to both Litman and Gioiella that the government was not intent on pushing the case to trial. For example, although the defendant filed a motion to dismiss on May 25, 1988, the government did not respond to the motion until July 18, 1989, more than a year later. (Tr. I at 37.) Gioiella testified that the Assistant United States Attorney ("AUSA") handling the case during that period, Ephraim Savitt, continually requested extensions of time to respond to the motion and that the defense repeatedly assented to his requests:

> I would tell Ephraim Savitt: if you don't want to respond, or you want more time, it's okay with me, but I have to get the response two months prior to the trial date ... I didn't have any interest in that one way or the other, but he obviously didn't want to respond to it, so that was fine with us.

> \*       \*       \*       \*       \*       \*

> Ephraim was a very nice guy, but he wanted this case like a hole in the head. He just didn't want to push the case. He would tell me he's got this other trial going on, this other matter—

> \*       \*       \*       \*       \*       \*

> He wouldn't say to me that he didn't want the case. He would just say ... he didn't have any interest in pushing the case, and he has a lot of other things to worry about, and he's got this other trial going and—

(Tr. II at 69–70.) The motion was denied by Judge Costantino from the bench on September 21, 1989.

The next scheduled control date was November 27, 1989. Prior to that date, howev-

er, AUSA Savitt wrote to Judge Costantino asking him to exclude time back to September 11, 1989 and forward to November 27, 1989. (Gov't Ltr.–Mem., Ex. 1.) The defense did not respond. (Tr. II at 83.) Judge Costantino issued an order on October 3, 1989 granting AUSA Savitt's request without explanation.

At the appearance on November 27, 1989, Judge Costantino scheduled the case for a February 9, 1990 control date, with the expectation that the case would be tried in late February. (Gov't Ltr.–Mem., Ex. K at 2.) This was the last occasion that Judge Costantino presided over the case because he fell ill during January 1990 and was no longer sitting on the bench by February 9, 1990. (Tr. II at 180.) Defense counsel viewed this additional delay as yet another opportunity to protract the retrial of the case and, accordingly, made no effort to have the case reassigned to another judge. (Tr. II at 25.) Gioiella testified that when he was asked by the AUSA who had taken over the case from Savitt whether he wanted her to do anything about the case, he "basically said no." (Tr. II at 25.)

### 3. The Proceedings Before Judge McLaughlin.

The delay due to Judge Costantino's illness lasted from February 9 to May 17, 1990, when a status conference was held by Judge McLaughlin, to whom the case had been reassigned. At that time, the Court and the attorneys engaged in a discussion, during which the government on its own initiative raised the speedy trial issue:

[AUSA] LUGER: The only other matter, your Honor, was speedy trial.

THE COURT: I imagine there are some glitches in there.

[AUSA] LUGER: Perhaps?

THE WITNESS:[9] Maybe I can address that.

(Gov't Ltr.–Mem., Ex. M at 5) (transcript of May 17, 1990 proceedings). Defense counsel

then summarized the nature of the entire delay:

THE COURT: But if the clock started to run again on [2/9], we're now on 5/17, we've got more than 90 days. Does that present a problem?

MR. GIOIELLA: Your Honor, I mean the history of this case is one in all honesty where there were a lot of adjournments for everybody involved. There were days we were ready, they weren't. They were, we weren't.

No one knew Judge Costantino was going to be out of the box for quite this length of time and there were a couple of times we thought the case had been reassigned and we had a phone call, I think, about it but it just never happened. So it is what it is.

We didn't formally waive, we didn't have the opportunity to waive but the case has a certain history which probably is relevant to some extent.

THE COURT: Do you have any feeling about what I should do about this issue? Is it going to be an issue?

MR. GIOIELLA: I probably would really need to talk it over with Mr. Patiwana which I haven't. My only feeling is at this point, given the nature of the case and the history of the case, like you say, quite honestly, I haven't spoken to [AUSA] Julie Copeland about this one. She still had the case. I had another case with her. She said what are we going to do about this case. I said I don't know. When we hear something about it, we'll do it. And I don't believe that it really is going to be an issue. That is my feeling but before I put any kind of waiver on the record, which I can't do without talking to my client, I think I ought to do that.

(Gov't Ltr.–Mem., Ex. M at 6–7.)

Although a motion to dismiss based on violations of the Act was discussed, no motion was made. In Litman's view, very little benefit would have resulted from such a motion:

---

9. Although the transcript misidentifies the speaker as "The Witness", it is obviously one of the two defense attorneys (Mr. Gioiella or co-defen-

dant's counsel Mr. Termini) who makes this comment.

It was our review and our discussions that in terms of the ultimate goal that very little benefit would result from seeking a speedy trial claim. All it would involve would be a potential dismissal of an indictment, in our view, without prejudice, a reindictment.

We'd be back to where we were, which was to try to devise a strategy that someone would actually listen to that this man, who shouldn't be deported, wouldn't be sent out of the country. And that was the basic strategy that we tried to follow, tried to get the Government to agree with ... So the issue of speedy trial as such did not appear to us as an arrow that had validity in the arsenal of weapons that was available to us in carrying out what we ultimately wanted to bring about.

(Tr. II at 167.) Gioiella testified that he was of the same view:

I felt like if we made a motion it would either be denied [because we had been consenting to the adjournments all along], because of our own generating the delay, or at the worst—or at the best, I should say, it would be granted without prejudice and we would lose Judge McLaughlin and [Patiwana would] just get re-indicted.

(Tr. II at 90.)

Gioiella also discussed the issue with Dershowitz, who had continued to act as an informal advisor to Patiwana. According to Gioiella's recollection, everybody agreed that there was no possibility the indictment would be dismissed with prejudice. (Tr. II at 90, 102–03.) Dershowitz, however, testified as follows: "I told [Gioiella] that when you have a [thirty-seven] month delay and you have a—I don't remember how long it was, five

years or so, from the event to the time of the trial, I thought a motion was in order." (Tr. II at 213.)

## C. The Speedy Trial Contentions.

During the *habeas* hearing, the government stipulated that eighty-four days were not excluded by the court and were chargeable against it, concededly constituting a violation of the Act.[10] (Tr. II at 4–6, 62–63.) These eighty-four days, however, comprise only a small portion of the periods of time which could have been the substance of a speedy trial motion. In fact, the government acknowledged at the hearing that there was a total of 234 days in which no order excluding time was entered. (Tr. I at 18.) Patiwana submits that there were two such additional periods of time: March 8, 1988 to May 2, 1988 (55 days); and February 10, 1990 to May 16, 1990 (96 days). *See* Pl. Chart titled "Days Covered By No Order Excluding Time".[11] Patiwana further argues that there was an additional 346 days of "improperly" excluded time because the court failed to articulate the basis for its determination that the time was excludable.[12] (Tr. II at 8.) Thus, Patiwana argues that there were 580 days out of the 1,131 days from the issuance of the mandate until the start of the retrial that should have been counted toward a violation of the Act.

In opposition, the government maintains that it was not responsible for the vast majority of the delay. Of the 1,131 days, it contends that: 407 days elapsed due to requests from Patiwana's counsel for adjournments; thirty-four days elapsed during the pendency of Patiwana's co-defendant's coun-

10. The government's stipulation was based on the following time periods: June 3, 1987 to June 17, 1987 (15 days); January 21, 1988 to March 6, 1988 (45 days); May 2, 1988 to May 24, 1988 (23 days); and November 27, 1989 to November 28, 1989 (1 day).

11. The chart, a summary of Ex. A through O, was used as an aid to the Court. (Tr. I. at 7–10.) It states that the following time periods were not covered by any order excluding time: June 3, 1987 to June 17, 1987 (15 days); January 22, 1988 to March 6, 1988 (45 days); March 8, 1988 to May 24, 1988 (78 days); and February 10, 1990 to May 16, 1990 (96 days).

12. According to the chart entered into evidence, the following are time periods for which there was no ends-of-justice analysis in the record: July 22, 1987 to September 16, 1987 (57 days); September 16, 1987 to November 4, 1987 (50 days); November 4, 1987 to January 21, 1988 (79 days); September 21, 1989 to October 20, 1989 (30 days); October 21, 1989 to November 27, 1989 (38 days); November 29, 1989 to February 9, 1990 (42 days); May 17, 1990 to July 5, 1990 (50 days).

sel's oral application to be relieved and to have new counsel substituted; 507 days elapsed while Patiwana's pre-trial motion was pending; ninety-seven days elapsed due to Judge Costantino's illness and the subsequent reassignment to Judge McLaughlin; and forty-nine days elapsed, after the case was assigned to Judge McLaughlin, which were covered by an order of excludable delay. (Gov't Ltr.–Mem. at 7–8.) Curiously, the government maintains that it has thus accounted for 1,099 of the 1,131 days and that "[t]his leaves only [thirty-two] days of delay unaccounted for, and assumably, properly chargeable to the prosecution." *Id.* at 8. It is not clear from the government's submission how this claim can possibly be reconciled with its concession at the hearing that there was a violation of the Act based on eighty-four days of nonexcluded time.

## D. The Ineffective Assistance Claims.

Based on his view of the delay and his trial counsel's failure to act with respect to the delay, Patiwana argues that he received ineffective assistance of counsel. First, he argues that Litman had an actual conflict of interest based on his allegiance to his other clients that adversely affected his representation. *See Cuyler v. Sullivan,* 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). Second, he argues that Litman's failure to make a speedy trial motion fell below an objective standard of reasonableness and that there was a reasonable probability that if the motion had been made the result of the proceeding would have been different, *see Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), because it would have been granted with prejudice. Alternatively, he contends that even if the motion would have been granted without prejudice, the government either would not have reindicted him or would have been amenable to a favorable plea disposition.

## II. DISCUSSION

■ Generally, in order to prevail on an ineffective assistance of counsel claim, a petitioner must establish that his counsel's conduct was inadequate under the standard established by *Strickland* whereby a petitioner must show: first, "that 'counsel's representation fell below an objective standard of reasonableness,'" *United States v. Coffin,* 76 F.3d 494, 498 (2d Cir.) (quoting *Strickland,* 466 U.S. at 687–88, 104 S.Ct. at 2064–65), *cert. denied,* —— U.S. ——, 116 S.Ct. 1445, 134 L.Ed.2d 565 (1996), and second, that there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland,* 466 U.S. at 688, 694, 104 S.Ct. at 2064–65, 2068. In order to satisfy the second prong, a defendant must "affirmatively prove prejudice" due to his attorney's conduct. *United States v. Kirsh,* 54 F.3d 1062, 1071 (2d Cir.) (quoting *Strickland,* 466 U.S. at 693, 104 S.Ct. at 2067–68), *cert. denied,* —— U.S. ——, 116 S.Ct. 330, 133 L.Ed.2d 230 (1995); *see United States v. Stantini,* 85 F.3d 9, 15–16 (2d Cir.1996). In the context of the Act, this means that Patiwana "would have to establish not only that his counsel failed to bring a timely speedy trial motion but also that [this failure] harmed [him]." *Parron v. Quick,* 869 F.2d 87, 89 (2d Cir.), *cert. denied,* 493 U.S. 860, 110 S.Ct. 171, 107 L.Ed.2d 127 (1989).

■ If, however, the ineffective assistance claim is predicated upon an actual conflict of interest, a separate standard applies. *Stantini,* 85 F.3d at 15–16,[13] "Instead of *Strickland,* [courts] apply the more lenient *Cuyler* standard." *Perillo v. Johnson,* 79 F.3d 441, 447 (5th Cir.1996). Under *Cuyler,* a petitioner need only show "that counsel 'actively represented conflicting interests' and that 'an actual conflict of interest adversely affected' counsel's performance." *Tippins v. Walker,* 77 F.3d 682, 686 (2d Cir.1996) (citing *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2066–67). To demonstrate ad-

---

**13.** Potential conflicts, as opposed to actual conflicts, are analyzed under the *Strickland* standard. *See, e.g., United States v. Levy,* 25 F.3d 146, 155 (2d Cir.1994) (" '[I]f a defendant establishes that her attorney has a potential conflict of interest, in order to prove that the conflict result-

ed in a violation of her Sixth Amendment right to effective assistance of counsel, she must demonstrate prejudice.' ") (quoting *Winkler v. Keane,* 7 F.3d 304, 307 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994)).

verse effect, a defendant must establish that a "lapse in representation" resulted from the conflict. *Stantini,* 85 F.3d at 15–16, *United States v. Malpiedi,* 62 F.3d 465, 469 (2d Cir.1995); *Winkler v. Keane,* 7 F.3d 304, 308 (2d Cir.1993), *cert. denied,* — U.S. ——, 114 S.Ct. 1407, 128 L.Ed.2d 79 (1994). In this Circuit, a defendant establishes a lapse in representation by demonstrating that a " 'plausible alternative defense strategy or tactic might have been pursued,' and that the 'alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests.' " *United States v. Levy,* 25 F.3d 146, 157 (2d Cir.1994) (citing *Winkler,* 7 F.3d at 309). "Once petitioner has shown that an actual conflict of interest adversely affected defense counsel's performance, prejudice to the petitioner is presumed and no further showing is necessary for reversal." *Lopez v. Scully,* 58 F.3d 38, 43 (2d Cir.1995); *see Stantini,* 85 F.3d at 15, ("[A] 'fairly rigid' presumption of prejudice applies.") (quoting *Strickland,* 466 U.S. at 692, 104 S.Ct. at 2067); *Tippins,* 77 F.3d at 686.[14] The Court first addresses the *Cuyler* claim.

## A. The *Cuyler* Claim: Did Patiwana's Defense Counsel Have an Actual Conflict of Interest that Adversely Affected his Representation of Patiwana?

The Court discerns from the record that there are two conflict scenarios presented by this case. The first is an alleged conflict based on Litman's time commitments to other clients. The second, mentioned only in passing in Patiwana's submissions but deemed noteworthy by the Court, is based on Litman's concern for his own reputation.

### 1. Did Defense Counsel Have a Conflict Based on His Representation of Other Clients?

■ The Court does not discern an actual conflict based on Litman's representation of other clients. Although Litman adjourned Patiwana's trial because of the Chambers

trial and the trials of other clients, the Court determines that Patiwana was aware of and acquiesced in these adjournments. The Court credits Litman's testimony that Patiwana was aware of Litman's other commitments, that Patiwana only wanted Litman to try the case, and that Patiwana was aware of the general strategy to delay the case to facilitate the prospects of a favorable disposition. Moreover, the Second Circuit has rejected the application of the *Cuyler* standard to claims based on an attorney being under "enormous time constraints in regard to prior trial commitments." *United States v. Zackson,* 6 F.3d 911, 921 (2d Cir.1993). In *Zackson,* the circuit court concluded that such a claim should be analyzed under the *Strickland* test, and that to do otherwise the court

> would have to conclude that virtually all busy defense attorneys, who may consider limitations on their own time when scheduling matters before the courts, or who have more than one client and schedule matters based on clients' needs, are inherently incapable of providing an adequate defense that would satisfy the requirements of the sixth amendment.

*Id.* The court concluded that this was something "[it was] not prepared to do." *Id.*

Even assuming that Litman's commitments to other clients created an actual conflict, the Court does not believe that it adversely affected his performance. Presumably, the alternative defense strategy that Litman failed to employ was the pursuit of a quick retrial. The Court finds, however, that Litman's decision to employ a strategy of delay was independent of his representation of other clients since he plausibly thought the strategy was beneficial.

### 2. Did Defense Counsel Have a Conflict Based on His Concern for His Own Reputation?

■ Defense counsel's position regarding the government's lackadaisical attitude was

---

14. The Second Circuit has recognized two conflict situations that are *per se* ineffective assistance of counsel, obviating the need for inquiry under *Cuyler* and *Strickland:* 1) where the person appearing as defense counsel was not a member of the bar, and 2) where counsel had a conflict of interest arising from the lawyer's implication in the defendant's crime. *Tippins,* 77 F.3d at 686.

to "let sleeping dogs lie." To that end, Patiwana's attorneys continually acquiesced in the government's requests for continuances, indicating in conversations with prosecutors that they had no concerns about the languid pace of the reprosecution. The case, however, did not languish indefinitely, and once it was reassigned to Judge McLaughlin it was clear that the government indeed intended to retry Patiwana. The Court believes that any new attorney then brought into the case would undoubtedly have made a speedy trial motion before Judge McLaughlin because there was little to lose and possibly something to gain. *Cf. Henry v. Scully*, 78 F.3d 51, 53 (2d Cir.1996); *Lopez*, 58 F.3d at 42 ("Lopez had much to gain and very little to lose had his attorney asked the court for a lower sentence."). Indeed the making of the motion at that time was clearly a plausible alternative defense strategy since the speedy trial clock had run and the court would have been constrained to grant the motion either with or without prejudice. *See infra* part II.B.1; *Lopez*, 58 F.3d at 42 ("The term 'plausible alternative defense strategy' does not embrace all possible courses of action open to a defense attorney; it refers to those which a zealous advocate would reasonably pursue under the circumstances."); *Winkler*,

7 F.3d at 309 ("[Petitioner] need not show that a strategy would have been successful, only that it 'possessed sufficient substance to be a viable alternative.' ") (quoting *United States v. Gambino*, 864 F.2d 1064, 1070 (3d Cir.1988), *cert. denied*, 492 U.S. 906, 109 S.Ct. 3215, 106 L.Ed.2d 566 (1989)).

Dershowitz testified that Gioiella had told him he was "embarrassed about making [a speedy trial] motion." (Tr. II at 23.) This suggests that counsel may have been more concerned about jeopardizing their friendly, quiescent relationship with the prosecution than with zealously representing their client's best interests.[15]

The ethical rules recognize conflicts based on an attorney's own interest and prohibit a lawyer from representing a client when such a conflict exists unless there is full disclosure. Canon 5 of the Model Code states that "A Lawyer Should Exercise Independent Professional Judgment on Behalf of a Client." Model Code of Professional Responsibility Canon 5 (1983). According to Ethical Consideration 5–1, this means that "the professional judgment of a lawyer should be exercised, within the bounds of the law, solely for the benefit of his client and free of compro-

---

**15.** The Court analyzes this type of conflict under *Cuyler*, although it has some reservation about doing so. The Court notes that the Fifth Circuit recently refused to apply *Cuyler* to a conflict based on an attorney's own interests and held that *Cuyler* only applied to conflicts based on multiple representation:

> The "conflict" between the lawyer's self-interest and that of his client is not a real conflict in the eyes of the law. Rather than being immobilized by conflicting ethical duties among clients, a lawyer who represents only one client is obliged to advance the client's best interest despite his own interest or desires. Even though his disloyalty does not leave the client bereft of counsel, it may well impinge on the effectiveness of his representation.

*Beets v. Scott*, 65 F.3d 1258, 1271 (5th Cir.1995) (8–5 *en banc* decision), *cert. denied*, —— U.S. ——, 116 S.Ct. 1547, 134 L.Ed.2d 650 (1996). However, no other circuit has followed this approach and the Fifth Circuit acknowledged that "uncertainty remains" as to the scope of *Cuyler*. *Id.* at 1268. Elaborating on this "uncertainty", the *Beets* dissent correctly noted as follows:

> The Supreme Court has not specifically addressed whether *Cuyler* applies to cases involving conflicts stemming from sources other than

multiple representation ... [citation omitted] ... Nevertheless as the majority concedes, this court, as well as every circuit court facing the issue has applied the rule of *Cuyler* to many types of conflict of interest.

*Id.* at 1295 (King, J., dissenting); *see, e.g., id.* at 1266 n. 10, 1296 n. 14 (listing numerous cases in which federal circuit courts have applied the *Cuyler* standard to conflicts between a defendant's and an attorney's own interests); *Daniels v. United States*, 54 F.3d 290, 294 (7th Cir.1995) ("A conflict of interest arises 'when the defense attorney ... [is] required to make a choice advancing his own interests to the detriment of his client's interests.' ").

The Second Circuit, in a "conflict" decision decided within the last month, *Stantini*, 85 F.3d 9, did not address the Fifth Circuit's limitation of *Cuyler* and has previously rejected any such limitation. *See Levy*, 25 F.3d at 153 n. 5 ("Some have questioned whether the Supreme Court's conflicts-of-interest doctrine, much of which developed in the context of joint-representation conflicts, is applicable in all conflict contexts.... This Circuit, however, has not questioned the universal applicability of the Supreme Court's conflicts precepts and has consistently applied the same basic doctrine in all conflict-of-interest situations.").

mising influences and loyalties." Model Code of Professional Responsibility EC 5–1.[16] Similarly, Model Rule 1.7(b) states, in pertinent part:

> A lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:
>
>> (1) the lawyer reasonably believes the representation will not be adversely affected; and
>>
>> (2) the client consents after consultation.

Model Rules of Professional Conduct Rule 1.7 (1994); *see also* ABA Standards Relating to the Administration of Criminal Justice 4–3.5(a) (1991) ("Defense counsel should not permit his or her professional judgment or obligations to be affected by his or her own political, financial, business, property, or personal interests.").

Although the specter of this type of conflict was raised by Dershowitz's testimony, it is not of sufficient magnitude under the circumstances of this case to warrant finding that Patiwana's counsel's relationship with the government had evolved into an actual conflict scenario. In that respect, the Court takes Gioiella at his word and credits his testimony that the motion simply was not made because defense counsel did not believe it would be beneficial:

> [I]f you want to know what the conversation [with Dershowitz] was, the conversation was that we've been consenting to these adjournments all along, we have never pushed for a speedy trial, when the case went into limbo I talked with Julie Copeland about it, and I told her not to worry about it, and she didn't need to put the case back on the calendar. And I felt like if we made a motion it would either be denied for that reason, because of our own generating the delay, or at worst—or at the best, I should say, it would be granted

without prejudice and we would lose Judge McLaughlin and he'd just get re-indicted. That's what I recall being the substance of the conversation.

> And I remember asking Nat: what do you think would happen, I mean, is there any possible way we could—this case could be, you know, dismissed with prejudice, and I think everybody agreed that it was not even a possibility.

> \* \* \* \* \* \*

> I didn't have any problem making the motion. That doesn't bother—that was of no import to me at all. The only issue that I felt was that given the fact that we had done all these consents and requests for adjournment, and given the fact that we had spoken to the Government, that those factors precluded the possibility of getting a dismissal with prejudice.

> That's the only reason that we were reluctant to make it, and that's why I say we sort of worked backwards. Our question was if we made this motion, what could we expect. We felt we can't expect a winner, that that just wasn't realistic.

(Tr. II at 89–90, 102–03.) In addition, defense counsel were concerned about placing themselves in a poor light before Judge McLaughlin. As Gioiella stated:

> I think we felt that [making the motion] would really not be a good way to start a trial in front of Judge McLaughlin, to go to him and say look, we've been consenting and we've been actively encouraging a delay here, now we want to play a technicality to get us out. If you could win, believe me, we would do it.

(Tr. II at 103.) Regardless of whether Patiwana's counsel's assessments or apprehensions were warranted, the Court is satisfied that they were not predicated upon or motivated by conflict concerns. *See Stantini*, 85 F.3d at 15–16, *Winkler*, 7 F.3d at 309. *Cf.*

---

**16.** The New York Code of Professional Responsibility retains the ABA Canons of Professional Ethics and their accompanying Ethical Considerations. In addition, the New York Code contains a specific disciplinary rule on this subject, DR 5–101, "Refusing Employment When the Interest of the Lawyer May Impair Independent Professional Judgment," which states:

Except with the consent of the client after full disclosure, a lawyer shall not accept employment if the exercise of professional judgment on behalf of the client will be or reasonably may be affected by the lawyer's own financial, business, property, or personal interests.
New York Code of Professional Responsibility DR 5–101 (1990).

*Levy,* 25 F.3d at 157 ("This case is unlike *Winkler,* where there were justifiable reasons other than the attorney's conflicts that better explained why alternative defense strategies were not pursued."). Since Patiwana has failed to satisfy the *Cuyler* test, he must establish a claim under *Strickland* in order to obtain *habeas* relief.

**B. The *Strickland* Claim: Did Defense Counsel's Failure to Make the Speedy Trial Motion Fall Below an Objective Standard of Reasonableness and Was There a Reasonable Probability that But For this Failure the Result of the Proceeding Would Have Been Different?**

■ Under the *Strickland* test, a court need not address its two prongs in any particular order since a finding that a defendant or petitioner has failed to satisfy one prong obviates the need to consider the other prong. *Strickland,* 466 U.S. at 697, 104 S.Ct. at 2069–70 ("There is no reason for a court deciding an ineffective assistance claim to approach the inquiry in [a particular] order or even to address both components of the inquiry if the defendant makes an insufficient showing on one."); *see Strouse v. Leonardo,* 928 F.2d 548, 556 (2d Cir.1991) (holding that the court need not address alleged deficiencies in counsel's performance where defendant failed to establish sufficient prejudice). Assuming that Patiwana has satisfied the first prong by establishing that the failure to make the speedy trial motion before Judge McLaughlin fell below an objective standard reasonableness,[17] he must still demonstrate that there was a reasonable probability that the outcome of the case would have been different if the motion had been made, in order to satisfy the second prong.

**1. Would the Indictment have been Dismissed With Prejudice?**

■ Given the government's concession that more than seventy nonexcludable days passed between the issuance of the mandate by the Second Circuit and Patiwana's retrial, it is clear that if a speedy trial motion was made before Judge McLaughlin he would have been required to dismiss the indictment. 18 U.S.C. § 3162(a)(2). However, whether dismissal of a speedy trial motion under the Act should be granted with or without prejudice is a decision "committed to the discretion of the district court," *United States v. Wilson,* 11 F.3d 346, 352 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 2142, 128 L.Ed.2d 870 (1994), and "neither remedy [is] given priority." *United States v. Taylor,* 487 U.S. 326, 335, 343 n. 15, 108 S.Ct. 2413, 2422–23 n. 15, 101 L.Ed.2d 297 (1988); *United States v. Giambrone,* 920 F.2d 176, 180 (2d Cir.1990) ("The Speedy Trial Act does not indicate a preference as between dismissals with and dismissals without prejudice."); *United States v. Simmons,* 786 F.2d 479, 485 (2d Cir.1986) ("[T]here is no presumption in favor of dismissal with prejudice in this circuit."). The district court's discretion is not plenary, but rather, is guided by considerations specifically enumerated in the Act:

> In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: the seriousness of the offense; the facts and circumstances of the case which led to the dismissal; and the impact of a reprosecution on the administration of this chapter and on the administration of justice.

18 U.S.C. § 3162(a)(2). In addition, the Supreme Court has recognized that in deciding whether to dismiss an indictment with or without prejudice courts should also consider if the defendant was prejudiced by the delay. *Taylor,* 487 U.S. at 334, 108 S.Ct. at 2418; *United States v. Caparella,* 716 F.2d 976, 980 (2d Cir.1983). The Court discusses each of these factors in turn.

**a. The Seriousness of the Charged Offense.**

■ The crimes for which Patiwana was convicted—conspiracy to possess with intent

---

17. By assuming that the failure to make the motion fell below an objective standard of reasonableness, the Court does not intend to suggest that the failure to employ a plausible alternative defense strategy necessarily satisfies the first prong of *Strickland.* The Court can certainly envision situations in which more than one viable defense strategy exists and where the failure to choose one or the other strategy would not necessarily fall below an objective standard of reasonableness.

to distribute heroin and possession with intent to distribute heroin—were clearly serious offenses, especially considering the quantity of heroin—two kilograms. *See, e.g., Taylor,* 487 U.S. at 328, 338, 108 S.Ct. at 2415, 2420 (narcotics charges involving 400 grams of cocaine were "serious"); *Wilson,* 11 F.3d at 350, 353 (conspiracy involving five kilograms of cocaine and fifty grams of cocaine base was "very serious"); *Simmons,* 786 F.2d at 485 (possession of six glassine envelopes containing heroin with intent to distribute was "serious" within the meaning of the statute). As a result, the first factor weighs heavily in favor of dismissal without prejudice.

### b. The Facts and Circumstances Leading to Dismissal.

■ Even if the Court were to credit Patiwana's contention that 580 days should be counted toward the violation of the Act, the Court would not be bound to dismiss the indictment with prejudice because "[i]n evaluating the ... facts and circumstances leading to dismissal, the court should focus 'on the culpability of the delay-producing conduct.'" *United States v. Saltzman,* 984 F.2d 1087, 1092 (10th Cir.) (quoting *United States v. Hastings,* 847 F.2d 920, 925 (1st Cir.), *cert. denied,* 488 U.S. 925, 109 S.Ct. 308, 102 L.Ed.2d 327 (1988)), *cert. denied,* 508 U.S. 964, 113 S.Ct. 2940, 124 L.Ed.2d 689 (1993). For example, delay resulting from intentional noncompliance with the Act or from other actions designed to gain unfair prosecutorial advantage would weigh heavily in favor of dismissal with prejudice. *See, e.g., Simmons,* 786 F.2d at 485–86; *Hastings,* 847 F.2d at 925 ("[T]he appropriateness of barring reprosecution increases in relatively direct proportion to the degree of culpability which attaches."); *United States v. Melguizo,* 824 F.2d 370, 372 (5th Cir.1987), *cert. denied,* 487 U.S. 1218, 108 S.Ct. 2870, 101 L.Ed.2d 906 (1988); *see also United States v. Nesheiwat,* 853 F.Supp. 583, 584 (N.D.N.Y.1994) ("[I]n this circuit, 'in the absence of a factually supported finding of bad faith or a pattern of neglect by the local United States Attorney, an "isolated unwitting violation" of the Speedy Trial Act cannot support a decision to dismiss with prejudice.'") (citations omitted).

Here, there is no allegation that any of the delay was the result of bad faith on the part of the government or caused by the government in order to gain a tactical advantage. To the contrary, the testimony at the hearing revealed that the first year and a half of delay was not attributable to the government, but was largely the result of the unavailability of Patiwana's defense counsel. The Court credits Litman and Gioiella's testimony that Patiwana wanted Litman to be his trial counsel and concludes that the initial period of delay was caused by the defendant, thereby weighing in favor of dismissal without prejudice, notwithstanding the length of the delay.

■ The second period of delay, however, can appropriately be characterized as evidencing a "demonstrably lackadaisical attitude on the part of the government attorney[s] [who were] in charge of the case." *Giambrone,* 920 F.2d at 180. Such an attitude may be taken into account and weighed against the government in evaluating the circumstances leading to the dismissal. *Id.* Nonetheless, the Court will not weigh this delay in favor of dismissal with prejudice where, as here, the defendant continually joined in and assented to the delay as part of a tacit strategy. *See United States v. Gambino,* 59 F.3d 353, 360 (2d Cir.1995) ("The provisions of the Speedy Trial Act are not to be mistaken for the rules of a game where defense counsel's cunning strategy may effectively subvert Congress' goal of implementing sound trial management."), *cert. denied,* —— U.S. ——, 116 S.Ct. 1671, 134 L.Ed.2d 776 (1996); *see also Wilson,* 11 F.3d at 353 ("[A]ppellants had consented to the delays and cannot now complain that they were harmed by them."); *United States v. Pasquale,* 25 F.3d 948, 953 (10th Cir.1994) ("[U]nder the circumstances of the case, [defendant] bears responsibility for much of the delay ... Rather than seek a speedy trial, [defendant] and his counsel waited passively, making no claim to prompt attention, and, moreover, knowingly sought and acquiesced in the continuance."); *United States v. Morety,* 702 F.Supp. 957, 961 (E.D.N.Y.1988)

Page 239

(Platt, J.) (dismissal with prejudice "particularly inapt" when the delay is largely attributable to the defendant).

As Gioiella testified, "We consented every time. And if—you know, if there was a technical violation because Judge Constantino [sic] didn't sign the order or whatever, in my mind we had consented every step of the way." (Tr. II at 91.) For example, with respect to the period of Judge Costantino's illness, Gioiella testified that he had spoken with AUSA Copeland during that period and essentially told her not to do anything about the case:

> During that exact three month period, from February to May, I saw Ms. Copeland, I know once, and I think twice, in the U.S. Attorney's Office on another matter. And she raised the case, said hey, you know, what should we do, should we try to get this on before another judge. And my response was look, you know, we haven't been pushing for a trial, so don't worry about it, we don't ... have any concern about it.

(Tr. II at 94.) This willingness to consent to adjournments grew out of a belief that the longer Patiwana was on bail, living a law-abiding life, the better his opportunity to avoid deportation if convicted and the greater the possibility that the government would agree to a non-drug disposition, which would not lead to deportation.[18]

Accordingly, although the Court does not condone the government's lackadaisical attitude, the facts and circumstances that would have led to dismissal of this case, when viewed in context and taken as whole, weigh in favor of dismissal without prejudice.

### c. The Impact of Reprosecution on the Administration of the Speedy Trial Act and on the Administration of Justice.

The third statutory factor that the district court must consider is the effect of reprosecution on the administration of the Act and the administration of justice. In *Gambino,* the Second Circuit paused to focus attention on that part of the Act that speaks to the public's right to a speedy trial:

> [T]he public has as great an interest in a prompt criminal trial as has the defendant. Certainly, the public is the loser when a criminal trial is not prosecuted expeditiously, as suggested by the aphorism, "justice delayed is justice denied."

*Gambino,* 59 F.3d at 360; *see Giambrone,* 920 F.2d at 181 ("[T]he public has an interest in expeditious punishment for a variety of reasons, including the fact that the closer in time the punishment is to the crime, the greater its rehabilitative effect."); *Caparella,* 716 F.2d at 981 ("[A] speedy trial is not only viewed as necessary to preserve the rights of defendants. Just as significant is the protection it accords to society's interest in bringing criminals to justice promptly."). The Court shares these concerns. Nonetheless, the public's right to a speedy trial does not here justify a finding that the dismissal would have been with prejudice, even though the administration of the Act and the administration of justice would best be served by such a dismissal. As the Supreme Court observed in *Taylor,* it is "self-evident" that

> dismissal with prejudice always sends a stronger message than dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays.... Nonetheless, the Act does not require dismissal with prejudice for every violation. Dismissal without prejudice is not a toothless sanction ... If the greater deterrent effect of barring reprosecution could alone support a decision to dismiss with prejudice, the consideration of the other factors identified in § 3162(a)(2) would be superfluous, and all violations would warrant barring reprosecution.

*Taylor,* 487 U.S. at 342, 108 S.Ct. at 2422.

Undoubtedly, a criminal defendant has no concern for the public's interest and

---

18. Litman testified that:
[W]e tried on several occasions [to see if the Government would agree] to a disposition that involved something other than a drug charge, a potential tax charge or something that would satisfy what the Government wanted and, on the other hand, did not compel the result that the laws in the immigration area seem to require.
(Tr. II at 148.)

the responsibility for safeguarding the public's right to a speedy trial rests squarely upon the prosecutor's office and the court. On this record, Patiwana should not benefit from their regrettable failures to safeguard the public's right. Moreover, while there may have been a lackadaisical attitude by the government in not seeking retrial within a reasonable period of time, there is no pattern of such practice by the United States Attorney's Office in this district. *See Giambrone*, 920 F.2d at 181 (dismissing with prejudice after noting a "cavalier attitude toward speedy trial rights" in the United States Attorney's Office in the Western District of New York and a "strong suggestion of a pattern of neglect."); *United States v. Clymer*, 25 F.3d 824, 832 (9th Cir.1994) ("[T]he Act's most severe sanction is appropriate where the surrounding circumstances lead us to conclude that district courts and United States Attorney's offices have failed to recognize or implement our long-standing precedents."). The Court is confident that the type of governmental delay and lackadaisical attitude towards reprosecution manifested in this case is aberrational and not likely to resurface.

### d. Prejudice to the Defendant from the Delay.

Finally, the Court considers and finds that the defendant was not prejudiced by the delay. As Gioiella testified, the delay was not going to have any effect on Patiwana's defense:

> [T]he case had been tried once previously, so there was really virtually no chance of losing evidence. You could possibly lose a witness, a live witness, but you couldn't lose evidence. Mr. LaRossa[, Patiwana's counsel at his first trial,] had done a very good job. His cross examination of the key witness, McShane, was good. So we didn't feel like there was a lot to be gained or lost in the sense of a witness not appearing. But we had also found that—the only real witness we had was the doorman. We had found him; we knew where he was. And in any event, frankly, he would

have read much better than he was as a live witness.

(Tr. II at 31.)

### e. Conclusion.

The sanction of dismissal with prejudice is a severe one, permanently barring the government from pursuing a set of charges against a defendant no matter how strong the evidence against that defendant may be, and thus, if employed, would clearly satisfy the second prong of the *Strickland* test. However, although the delay in this case was significant, the Court concludes that there was not a reasonable probability that the dismissal would have been with prejudice.

### 2. If the Dismissal had been Without Prejudice, Would the Result have been Different?

Notably, Patiwana does not argue that he would have been acquitted if the government had been required to reindict. Rather, he contends that the second prong of *Strickland* is satisfied even if the dismissal would have been without prejudice since there was a reasonable probability that he would not have been reindicted based on the following factors: 1) he had already served 27 months in prison; 2) the government had no interest in the case and was allowing it to languish; and 3) the government's main FBI witness was ill and unavailable to testify, although his first trial testimony was available. These arguments are counter-intuitive since the government did, indeed, retry Patiwana.

Patiwana further argues that a dismissal without prejudice would have opened up new possibilities to negotiate a plea to a non-drug offense. The Court cannot conclude that there was a reasonable probability that the government would have agreed to a non-drug plea if the indictment had been dismissed without prejudice since it had not agreed to such a plea during discussions that occurred throughout the long period of delay. As Litman acknowledged, "We had tried to get some kind of tax count or something, anything that was a non-drug plea, but ultimately they wouldn't go for it." (Tr. II at 33.)

### III. CONCLUSION

For all the foregoing reasons, Patiwana's petition for a writ of *habeas corpus* is denied.

**SO ORDERED.**